## GERALD S. KLEIN, Trustee *v.* LLOYD O. WHITEHEAD ET AL.

[No. 1068, September Term, 1977.]

*Decided July 12, 1978.*

2

The cause was argued before DAVIDSON, LISS and WILNER, JJ.

*Gerald S. Klein,* with whom were *Abraham L. Adler* and *Thomas E. Webb* on the brief, for appellant.

*George J. Goldsborough, Jr.,* with whom were *Goldsborough, Franch & Collett* on the brief, for appellee Whitehead. *Sally D. Adkins,* with whom were *Raymond S. Smethurst, Jr.,* and *Adkins, Potts & Smethurst* on the brief, for other appellees.

WILNER, J., delivered the opinion of the Court.

Charles Parsons was a man of modest means, who "was looking for something a little better than what I had." He found instead something a lot worse than what he had, a discovery which ultimately required him to declare bankruptcy. The method by which he proceeded from the status of modest means to that of no means prompted this lawsuit by appellant Gerald Klein, the trustee in bankruptcy, against those persons whom Mr. Klein believes were responsible for the decline in Mr. Parsons' fortunes. Unfortunately, the factual basis of Mr. Klein's claim is somewhat complex, requiring a detailed recitation of what occurred.

In November, 1972, Mr. Parsons earned his living as a truck-driver and through his ownership of a small home heating oil delivery business. His total assets, including his house and business, amounted, at best, to $6,500. With these

resources, on November 4, 1972, he signed a contract to purchase a restaurant business, known as Carter's Scales and Restaurant, from one Paynter Dukes for $75,000. He gave a deposit of $500, the balance of $74,500 being due in cash at time of settlement (on or before 30 days) "contingent upon the purchaser being able to secure suitable financing."

When it became apparent that Mr. Parsons would be unable to obtain conventional financing from a bank, the real estate agent, Monroe Haltaman, contacted Edgar Dryden, one of the appellees here.[1] Mr. Dryden was an international vice-president of the Plumbers and Pipe Fitters Union who lived on the Eastern Shore and, according to his testimony, had bought and sold property and "loaned a couple of people money" in the past. In an attempt to induce Dryden to put up the necessary funds to complete the purchase, Haltaman arranged a meeting between Parsons and Dryden, who theretofore had never met.

Dryden, at the time, was not told about the November 4 contract. He and Parsons met on several occasions to discuss the venture and Dryden's financing of it; and, according to Dryden, "I told him that if I got in this venture at all there had to be certain safeguards, there had to be some control over the salaries...." Dryden further indicated that he would "have a document prepared by my attorney to present on the day of ratification" presumably incorporating these safeguards and controls.

On the evening of November 24, 1972, Mr. Haltaman arrived at the Dryden home, during the course of a party, with a new contract of sale, already signed by Dukes (the seller) and by Mr. and Mrs. Parsons. This contract showed a purchase price of $65,000 (a $10,000 reduction), no contingencies with respect to financing ("cash at the time of settlement"), and Ruth and Edgar Dryden as buyers, along with Charles and Doris Parsons. Settlement was to be held

---

1. Parsons testified that he made no effort, personally, to obtain bank financing, but that the real estate agent attempted to arrange that for him. Elton W. Wessells, a Vice-President of the Truckers & Savings Bank, testified that a loan application by Mr. Parsons was made on November 9, 1972, and that it was rejected four days later.

4

the following Monday (November 27) in the law office of Don Richardson, who, at that point, represented Dukes. Dryden testified that he asked Haltaman why he (Dryden) should sign the contract, to which the agent responded, "Well, the Dukeses don't think it would be a viable contract unless you sign it. They want someone else to sign on there. It won't be any responsibility of yours to sign it except let the Dukeses know that it will go through with." Upon that basis, according to Dryden, and in the belief that it was the Parsonses and not the Drydens who were actually buying the business, Mr. and Mrs. Dryden then and there signed the contract. At that point, Dryden was under the impression that Parsons would put up $20,000 and that he (Dryden) would finance the balance of $45,000.

According to Dryden, "after I signed the Contract I began to think that night, and I called my attorney [Lloyd Whitehead, another of the appellees] and told him I made a boo-boo and I'd like to get out of it." As a result, Whitehead arranged a meeting, in Whitehead's office, among Richardson, Dukes, Parsons, Dryden, and Whitehead for the purpose of attempting to extricate Dryden from the contract. This attempt was unsuccessful. Dryden stated that, "I was informed by Mr. Richardson and the Dukeses that they were not going to let me off the hook if I did not proceed with the contract" and that, if there was a default, he would be sued "for the total amount of the money."

At that point, Dryden still believed that Parsons would come up with $20,000, and that his obligation was for $45,000. He contacted the Truckers & Savings Bank (the same bank that had originally rejected Parsons' application) and arranged for a $25,000 mortgage loan to the Parsonses, secured by the property to be purchased and the guarantee by Dryden and his wife, and a $20,000 personal loan to him, the proceeds of which he would, in turn, lend to the Parsonses.

On December 1, 1972, the parties gathered again in Mr. Whitehead's office, for settlement.[2] At this point, Dryden

---

2. Apparently, the time for settlement, set in the contract for November 27, had been extended, and the place switched from Mr. Richardson's office to that of Mr. Whitehead.

first learned that Parsons was able to produce only $8,500 — not the expected $20,000.[3] As a result of the shortfall, settlement was temporarily postponed, and Dryden and the Parsonses paid another call on the banker. He agreed to lend Dryden an additional $11,500 on an open promissory note, and Dryden agreed to re-lend this money to Parsons. Appropriate notes and other loan documents from Dryden to the bank and from the Parsonses to Dryden, evidencing this transaction, were executed. Everyone then returned to Whitehead's office, where Whitehead read, and the parties ultimately signed, a document prepared by Whitehead entitled "Agreement of Sale."

This Agreement, in its first six paragraphs, recites essentially the background to that point — the contract entered into by Parsons to buy the restaurant, his inability to finance the purchase, and the Drydens' role as financiers. Paragraph 7 obligated Parsons to devote full time to the business, and to keep it open 24 hours a day, seven days a week. Paragraphs 8 and 9 provided for a weekly salary of $75 to Doris Parsons and $125 to Charles, until such time as "all indebtedness against the said business is paid", at which point Charles' salary would increase to $200. In the interim, the $75 differential (between $125 and $200) was to be paid "toward the reduction of indebtedness over and above the first and second mortgage".

In succeeding paragraphs, the written approval of Dryden was required for any purchases in excess of $25 and for "any financial commitments [by Parsons] personally or major purchases ... as this may adversely affect the credit of PARSONS and may endanger the security of DRYDEN who has guaranteed certain indebtedness of PARSONS and who is owed money by PARSONS. ..." These restrictions would last only so long as Parsons was indebted to Dryden. Paragraph 13 obligated Parsons to procure a life insurance

---

3. Mr. Parsons testified that he believed his obligation was to put up his house, his business, and a 43-acre tract that he owned. He recalled being asked about raising $20,000 but could not remember who asked him or what his response was. He said that he doubted that he could have obtained such a sum.

policy on his life for $65,000, payable to his creditors, including Dryden and the bank. Paragraph 14 obligated Dryden to conduct a semi-annual audit of the business, and entitled him to 40% of any profits earned by the business. Paragraph 15 provided that, if Parsons desired to "eliminate DRYDEN from the business" or if Parsons defaulted on his obligations, the business would be appraised by three appraisers (two appointed by Dryden), all indebtedness would be paid, and Dryden would be paid an amount equal to 40% of the difference. The next two paragraphs required Parsons to open and maintain four checking accounts and to attempt to negotiate with a major oil company to "get gasoline services into the business."

Finally, paragraph 19 provided that "as long as DRYDEN is owed any money by PARSONS or has guaranteed any indebtedness of PARSONS", Whitehead would be "Attorney for this business" subject to replacement by Dryden. All legal fees of the business were to be paid by the business.

Along with this agreement, the following other documents were also duly executed in implementation of the various transactions:

(1) Deed to the restaurant property from Dukes to Charles and Doris Parsons (the Drydens not being parties to the deed);

(2) Mortgage for $25,000 from Mr. and Mrs. Parsons to the Truckers & Savings Bank, secured by the restaurant property, payable over a 10-year period, with interest at the rate of 8% per annum, in monthly installments of $303.32;

(3) Second mortgage for $20,000 from the Parsonses to the Drydens, also on the restaurant property, payable in 120 monthly installments of $264.31, interest being at the rate of 10% per annum;

(4) Note for $13,476, payable in 48 monthly installments of $280.75, from the Parsonses to the Drydens secured by a chattel mortgage on the inventory and furnishings of the business; [4]

---

4. This was in reference to the $11,500 borrowed by Dryden and lent to Parsons. The $13,476 was arrived at by adding, in advance, $1,976 in interest to the $11,500 principal amount of the loan.

(5) Settlement sheet showing the "Purchaser" to be "Mr. & Mrs. Charles Parsons";

(6) Promissory note from the Parsonses to Whitehead's firm for $980.62 to cover the settlement costs; and

(7) Promissory note from the Parsonses to Whitehead's firm for $1,000 to cover Whitehead's fee for legal services.

Whitehead stated that, at the time of settlement, he had made it clear to Parsons that Dryden travelled extensively as part of his job with the union, that he was "strictly doing the financing" and that "he was not participating in the restaurant. He didn't want to run a restaurant." Parsons testified that he understood that to be the case — that he and his wife would operate the restaurant, and that Dryden's role was simply to provide enough money to enable him (Parsons) to purchase the business.

Less than three weeks later, the repayment schedules on the second mortgage and the note to Dryden were modified, apparently by agreement between Dryden and Parsons. Payments on the second mortgage were increased from $264.31 per month ($3,168 per year) to $4,000 per year, and payments on the note were increased from $280.75 per month ($3,362 per year) to $75 per week ($3,900 per year).[5] This new arrangement was evidenced by a written memorandum dated December 20, 1972, from Dryden to Parsons.

It soon became apparent that the operation would not be as successful as was anticipated, and with that realization the relationship between the parties began to deteriorate. The Parsonses failed to make their payments regularly, they incurred additional debts without prior consultation, Mr. Parsons ceased working full time at the restaurant and took a part-time job driving a truck, and, at one point, they attempted to sell a truck owned by the business that was pledged as collateral to Dryden under the chattel mortgage securing the $13,476 note. On the other hand, Dryden began to interject himself more and more into the operation of the

5. It would appear that the increase to $75 per week with respect to the note was consistent with what had been anticipated in paragraph 9 of the "Agreement of Sale" prepared by Whitehead.

business. In June, 1973, he closed the four checking accounts, then requiring the joint signatures of Parsons and Dryden, and deposited the funds in four new accounts requiring the signatures of himself and the bookkeeper for the business, Sandra White. The effect of this, obviously, was to eliminate Parsons as an authorized signatory on any of the business bank accounts.[6]

The decline in the fortune of the business, and with it the tolerance of Dryden and Parsons toward the actions and inactions of the other, continued. At one point, Parsons consulted Mr. Richardson, the attorney who had represented Dukes, but Dryden refused to deal with Richardson. Although payments on the first mortgage to the bank were kept current, payments on the two obligations to Dryden, and payments to general creditors, were irregular. At several points, Dryden warned Parsons that if things did not straighten out, he would foreclose, but Parsons stated that he "didn't pay any attention" to those warnings.

Finally, in March, 1974, Dryden turned the matter over to Whitehead, and directed him to institute legal actions on the notes due him. Pursuant to this direction, Whitehead filed four actions in the Circuit Court for Wicomico County on behalf of the Drydens. They were:

(1) Civil Case No. 8439, filed March 19, 1974, wherein the Drydens obtained a judgment by confession against the Parsonses for $10,626 (plus interest, costs, and "collection charges" of 20%), the amount alleged to be due and owing on the $13,476 note. A writ of *fiere facias* to seize certain chattels owned by the business was issued and levied.

(2) Civil Case No. 8440, also filed March 19, seeking and obtaining an attachment against a bank account of the Parsonses at the Farmer's Bank of Willards.

(3) Chancery No. 16,486, filed March 20, foreclosing on the chattel mortgage securing the $13,476 note.

---

6. In February, 1974, Dryden fired the bookkeeper, and, at that time, made Mrs. Parsons a co-signatory on two of the accounts. The account from which the payments on the second mortgage were drawn remained under Dryden's exclusive control.

(4) Chancery No. 16, 487, also filed March 20, foreclosing on the second ($20,000) mortgage, and seeking the appointment of a receiver to operate the business until a foreclosure sale was made and ratified. The Affidavit of Indebtedness filed in this proceeding showed a balance due on this mortgage of $19,503.58.

Parsons was duly served with all of the necessary papers pertaining to these actions, and he promptly consulted Mr. Richardson. He reviewed these papers, and his own records (including records prepared by an accountant retained by Parsons) with Mr. Richardson, explaining what he had paid on these various obligations. Richardson contacted Whitehead and offered, on behalf of Parsons, to bring the payments current (although Parsons had not given him any funds with which to carry out that offer), but Whitehead replied that the entire debt had been accelerated. No tender of payment was ever made by or on behalf of Parsons. Richardson stated that he made no effort to stay or defend the foreclosure proceedings because Parsons told him he was going to refinance the venture and pay Dryden what was owed. The key part of this testimony was as follows:

"Q. Did it occur to you to take the position with the Circuit Court for Wicomico County that you questioned whether your clients were actually in default or not? A. Well, Mr. Parsons kept telling me that he wasn't in default and, of course, the papers showed otherwise.

I never did file any papers to stay the fore- closure proceedings.

Q. You considered doing so? A. I did, however, at one point.

Q. And decided against that step? A. Yes, sir, because Mr. Parsons was trying to refinance the whole mortgages and the notes, and everything else . . . that Mr. Dryden had.

Q. But, at least, you considered and weighed the merits of filing some action to enjoin these proceedings, did you not? A. Yes, sir.

Q. And after giving the matter some thought decided not to do so? A. Well, I thought it was going to be paid off, Mr. Goldsborough.

Q. You thought it would be futile? A. No, I thought it was going to be paid off. I thought all of the indebtedness were going to be paid off by the Parsonses.

* * *

Q. Did you ever take any steps, on behalf of your clients, to challenge the legitimacy of the foreclosure proceedings after the fact? A. No, sir.

Q. You didn't raise any objection to the ratification ... of the Receiver's report? A. No. because it wouldn't have made any difference. The Parsonses didn't have any money to pay the deficiency, so I just wasting my time."

Richardson did file, in No. 8439 (the confessed judgment action), a claim on behalf of Mr. and Mrs. Parsons for their $1,000 statutory exemption from the levy of the writ of *fi fa,* and a claim with respect to certain of the property levied upon on behalf of one of their children.

There being no defense to the foreclosure actions, a sale of the mortgaged property was held on April 13, 1974, with Parsons in attendance. Dryden purchased the real estate securing his second mortgage for an amount equal to $21,931 over the balance due on the first mortgage. The chattels were sold to various bidders. As a result, a deficiency of $2,038 was ultimately reported with respect to the second (real estate) mortgage, and a deficiency of $8,928 was reported with respect to the chattel mortgage. No exceptions were filed either to the reports of sale or to the auditors' reports, and, as a result, all of them were, in due course, ratified by the court. The Parsonses had lost everything; and a year later, in April, 1975, they filed a voluntary petition in bankruptcy.

In January, 1976, Mr. Klein filed this action in the Circuit Court for Worcester County against Whitehead, his law firm,

and the Drydens. The Declaration contained four counts; but the basis of them all was the assertion that the business was a partnership, that the defendants stood in a fiduciary relationship with Mr. and Mrs. Parsons (Whitehead and his firm as legal counsel, the Drydens as partners), and that they fraudulently and deliberately conspired to deprive the Parsonses of their property, thus breaching their respective fiduciary obligations. Reciting some of the history set forth above, Klein charged the defendants in Count I with civil conspiracy to cheat and defraud the Parsonses, and, through them the bankruptcy estate, alleging that they conspired to deprive the Parsonses of their property by fraud and deception and by failing to carry out their fiduciary obligations. Count II, based upon the same facts alleged in Count I, charged Whitehead and his firm with professional malpractice. Count III charged all defendants with fraud and deceit, independent of the conspiracy; and Count IV charged them with misappropriation. The only relief sought was damages in the amount of $1,430,000.

Whitehead's firm and Mrs. Dryden were dismissed preliminarily. The case against Whitehead and Mr. Dryden proceeded to trial; however, at the end of the trial the court concluded that Klein was barred from prosecuting the action by the doctrine of collateral estoppel and directed a verdict in favor of both defendants. The correctness of that action is what is before us.

The proper application of the law often comes down simply to understanding the relationships among several independent principles — recognizing the similarities and the distinctions between them. This is not always an easy thing to do. Concepts that are quite different — that stand on separate bases and that mean different things — often overlap with each other. When this occurs, the terms used to denote these separate concepts sometimes begin to be used interchangeably, as though they meant the same thing, one being but a synonym for the other; and thus confusion comes about as the differences in the concepts themselves become blurred.

So it is with the doctrines known as *res judicata,* collateral estoppel, and collateral attack. *See, for example,* 46 Am.Jur.2d *Judgments,* § 397. All three of these derive immediately from the larger jurisprudential demand that properly entered judgments be regarded as final, a concept which itself emanates from, and is required by, the societal need for certainty in the law. These three doctrines, though related, are different; they apply in different circumstances and they prevent different things. Unfortunately, the distinctions between and among them are not often clearly understood. In this case, the lower court reached the right result for the wrong reason.

Part of the confusion emanates from the somewhat murky nature of appellant's causes of action. Though based upon different legal theories, in each case he asserts that the Parsonses (and, through them, he) were injured because of the various proceedings instituted by Whitehead on behalf of, at the behest of, and in complicity with, the Drydens, that these proceedings were instituted and prosecuted to judgment fraudulently, and that the various judgments, orders, and decrees rendered by the court, and the actions taken to execute and implement them, were procured by fraud. He does not attempt in this proceeding to have any of the prior judgments stricken or any of the actions taken pursuant to them set aside. Nor does he ask, directly, to be excused or exempted from the actual operation of those judgments or actions. The relief sought is civil damages arising from the consequences of those judgments and implementing actions, and he therefore, of necessity, gives at least *de facto* recognition to them. But, on the other hand, he quite clearly asserts, at least twice in his brief, the right "to bring this action and collaterally attack the prior judgments for fraud. . . ."

It is evident — and indeed it was conceded by appellant at oral argument — that every ground alleged in this action to justify his "collateral attack" and to support his claim for damages could have been raised by the Parsonses as a defense in the proceedings from which the earlier judgments arose. His assertions that the obligations were not truly in

default, that if in default there were funds available to cure the default, that any default arose through the fraud, deceit, conspiracy, or breach of fiduciary obligations on the part of Whitehead and the Drydens — all these could have been asserted to defend against the two foreclosures and to vacate the judgment entered by confession. It is equally clear, however, that, though these issues might have been raised in the earlier proceedings, in fact they were not; and thus, except to the extent that a resolution of some of them may be said to be implicit from the judgments, decrees, and orders entered by the court, they have not heretofore been adjudicated. The question now is whether they may be raised in this proceeding, and, if not, why not.

We start by considering the relationship between *res judicata* and collateral estoppel. Both are branches of a doctrine known as estoppel by judgment; *res judicata* is a direct estoppel, and collateral estoppel is what its name says it is. The distinction between the two was first discussed in depth by the Court of Appeals in *LeBrun v. Marcey*, 199 Md. 223 (1952) where, quoting from two earlier Supreme Court cases,[7] it noted, at 226:

> "The scope of the estoppel of a judgment depends upon whether the question arises in a subsequent action between the same parties upon the same claim or demand upon a different claim or demand. In the former case a judgment upon the merits is an absolute bar to the subsequent action. In the latter the inquiry is whether the point or question to be determined in the later action is the same as that litigated and determined in the original action . . . . In the former case, the judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. It is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat

---

7. Tait v. Western Maryland Ry. Co., 289 U. S. 620 (1933); Cromwell v. County of Sac., 94 U. S. 351 (1877).

the claim or demand, but as to any other admissible matter which might have been offered for that purpose. . . . But where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, the inquiry must always be as to the point or question actually litigated and determined in the original action, not what might have been thus litigated and determined. Only upon such matters is the judgment conclusive in another action."

This distinction, based upon whether the second action is the same as or different from the first, was restated, more succinctly, in *Sterling v. Local 438, Etc.,* 207 Md. 132 (1955), *cert. denied* 350 U. S. 875 (1955). At page 140, the Court held:

"Estoppel by judgment, which is *res judicata,* may be direct or collateral. If the second suit is between the same parties and is upon the same cause of action, a judgment in the earlier case on the merits is an absolute bar, not only as to all matters which were litigated in the earlier case, but as to all matters which could have been litigated. If, in a second suit between the same parties, even though the cause of action is different, any determination of fact, which was actually litigated in the first case, is conclusive in the second case."

Unfortunately, in two subsequent cases,[8] the Court used some very broad language to describe *res judicata* that led it in a third case [9] to overlook the distinction between direct

8. Alvey v. Alvey, 225 Md. 386, 390 (1961); Pat Perusse Realty Company v. Lingo, 249 Md. 33, 35 (1968).
9. Missler v. Anne Arundel County, 271 Md. 70, 77 (1974).

and collateral estoppel, and indeed to suggest that there was no distinction. In *Frontier Van Lines v. Md. B. & Tr. Co.,* 274 Md. 621 (1975), however, the Court made absolutely clear that the distinction was real and would be observed, a holding which was reaffirmed in *MPC, Inc. v. Kenny,* 279 Md. 29 (1977). In this last case, *MPC, Inc.,* the Court stated, at page 33:

> "Suffice it to say that the question whether this is a case of res judicata on the one hand or collateral estoppel on the other is one of critical importance. If, for example, the two causes of action are the same, and res judicata is therefore applicable, the first judgment would bar appellants . . . from raising any matters which could have been decided in that case. . . . If, however, we are not dealing with the same cause of action, collateral estoppel rather than res judicata would apply and only those determinations of fact or issues actually litigated in the first case are conclusive in this action." [10]

With this background, it is possible to construct a simple comparative checklist for determining which, if either, of the two doctrines is applicable. For either to apply, the second action must be between the same parties or those in privity with them.[11] For direct estoppel to apply, it must be shown, in addition, that the two causes of action are the same. Collateral estoppel does not require that the causes of action be the same, but it applies only with respect to issues of fact actually determined in the earlier proceeding.

Our analysis begins with the question, or requirement,

---

**10.** This statement is completely faithful to the distinction in concepts first set out in Le Brun v. Marcey, *supra.* It appears to be inconsistent, however, with the nomenclature used, and defined, in Sterling v. Local 438, Etc., *supra.* There, as noted, the Court treated "res judicata" as equivalent to the broader term "estoppel by judgment", embracing both direct and collateral estoppel. In MPC, Inc., *supra,* the Court equated "res judicata" with what the earlier Court considered to be only one branch of res judicata — namely direct estoppel. *See,* in particular, 279 Md. at 32. We can be true to both cases by using the term "direct estoppel" in lieu of "res judicata"

**11.** *See, however,* MPC, Inc., *supra,* at 34-36, for a discussion of the relaxation of that requirement.

common to both doctrines: are the parties the same? Although technically, of course, they are not, legally, the requirement is satisfied. Appellant contends that, as trustee in bankruptcy, he represents and stands in the shoes of the general creditors of Mr. and Mrs. Parsons, rather than those of the bankrupts themselves. Thus, he says, he is a stranger to the earlier proceedings, and for that reason is neither directly nor collaterally estopped. The law, however, is otherwise.

The status of a trustee in bankruptcy, in this context, emanates from section 70 of the Bankruptcy Act (11 U.S.C. § 110). Subsection (a) thereof vests in him, by operation of law, certain types of property of the bankrupt, among which are "(5) property, including rights of action, which prior to the filing of the petition he could by any means have transferred ..." and "(6) rights of action arising upon contracts, or usury, or the unlawful taking or detention of or injury to his property." The title to this property which he acquires is that "of the bankrupt as of the date of the filing of the petition initiating" the bankruptcy. Included among the "rights of action" that so pass to the trustee are rights of action based upon fraud, deceit, misrepresentation, and breach of contract. *See Moore v. Slonim,* 426 F. Supp. 524 (D. Conn., 1977), *aff'd* 562 F. 2d 38; *Hermsmeyer v. A.L.D., Inc.,* 239 F. Supp. 740 (D. Col., 1964); *Constant v. Kulukundis,* 125 F. Supp. 305 (S.D.N.Y., 1954). Thus, under section 70(a), the trustee has the same right of action against appellees as the Parsonses had on the date they filed their petition in bankruptcy. To that extent, he stands clearly in privity with the Parsonses, who were, of course, parties to the earlier actions.

The trustee has more pervasive rights, however, under section 70(c). This provides him, in essence, with all of the rights, remedies, and powers with respect to the bankrupt's property that a secured (lien or judgment) creditor of the bankrupt, real or fictional, had as of the date of the bankruptcy petition. This section, appellant contends, places him in privity with the creditors of the bankrupts, who were strangers to the earlier proceedings, rather than with the

bankrupts themselves. The law, however, is again to the contrary. Moore [12] states:

> "In general the trustee takes the bankrupt's estate charged with liabilities and encumbrances that are valid against the bankrupt. To this extent he is in privity with the bankrupt. And if, for example, a court, prior to bankruptcy, rendered a valid in rem decree foreclosing a mortgage as against the debtor or a valid in personam judgment in favor of a creditor, these pre-bankruptcy judgments, binding upon the debtor, are normally conclusive upon his privy, the trustee."

See also *Friedman v. Chesapeake Supply & Equipment Company,* 178 F. Supp. 206 (D. Md., 1959); *Fox v. McGrath,* 152 F. 2d 616 (2nd Cir., 1945), *cert. denied* 327 U. S. 806 (1946); *Res Judicata and Collateral Estoppel in Bankruptcy,* 58 Yale L.J. 1, 4 (1968); Collier on Bankruptcy (14th Ed.), Vol. 3A, § 63.11, pp. 1833-1834.

Thus, whatever special rights the trustee or the Bankruptcy Court may have to set aside fraudulent judgments in the bankruptcy proceeding itself, or to disallow claims in that proceeding based upon such judgments, or, where permitted, to proceed in State court to attack fraudulent judgments, the trustee cannot escape the bar created by direct or collateral estoppel, to the extent that it is otherwise applicable, on the ground that, as to him, the action is not between the same parties. For purposes of this action, he is deemed to be in privity with the Parsonses.

With respect to appellees, the Drydens, of course, were parties to the former proceedings, so an identity exists as to them. Neither Whitehead nor his firm were parties in the earlier actions, and therefore there is no identity as to them. However, with the relaxation in this requirement of identity of parties, as described in *MPC, Inc. v. Kenny (see* footnote 11, *supra*), the lack of identity as to those persons would not serve to bar the application of estoppel by judgment if all

---

12. 1B Moore's Federal Practice, § 0.419, p. 3124.

other criteria are met. They may assert the bar of direct or collateral estoppel even though they were not parties to the prior proceedings.

Having established the common threshold requirement, we turn to see whether the causes of action are the same, this being a secondary requirement for direct estoppel. The test here is whether the same evidentiary facts would sustain both actions. *MPC, Inc. v. Kenny, supra,* 279 Md. at 29. The test was stated this way in Freeman on Judgments, 5th Ed., Vol. 2, § 687, quoting in part from *Kiniry v. Davis,* 200 Pac. 439 (Okl., 1921):

> " 'The cause of action is the same when the evidence will support both actions; or, rather the judgment in the former action will be a bar, provided the evidence necessary to sustain the judgment for the plaintiff in the present action would have authorized a judgment for him in the former.' *If this identity of evidence is found, it will make no difference that the form of the two actions is not the same."* (Emphasis supplied.)

Stating the test is a considerably easier task than applying it. Applying the test literally, and in mechanical fashion, it would appear that the causes of action are the same. As noted earlier, appellant conceded the obvious when he agreed that every ground alleged in this action to support his claim for damages could have been raised by the Parsonses as a defense in the earlier cases. More important, the evidence necessary to prove the allegations made here, if offered and accepted (*i.e.*, believed) in the earlier cases, would have justified a judgment favorable to the Parsonses in those actions. If the "identity of evidence" test is to be followed strictly, therefore, the causes of action must be deemed the same, and this proceeding would be barred by direct estoppel.

As mechanical and precise as this analysis, and the conclusion it requires, may be, it nevertheless leaves us with a somewhat strained result. It requires us to hold that an action by a losing party against his successful suitors, for damages arising from the consequences of the defendants'

earlier success, is the same as the original action, notwithstanding that not only the form of the two actions, but as well the circumstances, underlying theories, and reliefs sought by the parties therein are wholly different. If, by virtue of applying the "identity of evidence" test, this situation falls within the realm of the "same cause of action," it lies at the outer reaches of that realm. Nonetheless, the "identity of evidence" test is the relevant and controlling test, and, based upon it, it would appear that this proceeding is barred by direct estoppel. Fortunately, however, it is not necessary to rest our decision solely upon this ground, as the action is also precluded upon another theory.

Before considering that theory, however, we should discuss the ground relied upon by the lower court — that of collateral estoppel. For that doctrine to apply, we must conclude that the issues raised in this proceeding were actually litigated in the earlier actions (or that the facts necessary to resolve these issues were adjudicated in those actions). This we are unable to do.

We may accept the fact that, in ordering the foreclosure, ratifying the sale, and ratifying the auditors' reports in the foreclosure proceedings, and in entering judgment and issuing the writ of *fi fa* and the attachment in the confessed judgment proceeding, the court, implicitly if not directly, concluded that the obligations were valid, due and owing, and in default in the respective amounts alleged. To the extent that these are issues in this current case, they may be said to have been previously litigated. However, as we have stated, this case involves a great deal more than whether the obligations were in default and whether the amounts alleged to be due were correctly stated. At issue here — indeed the central issue here — is whether appellees were guilty of fraud, conspiracy, violation of fiduciary obligations, and, with respect to Whitehead, professional malpractice. Bearing upon these issues is whether the enterprise that owned the restaurant was a sole proprietorship or a partnership in which the Drydens were partners. None of these questions were raised or decided in the earlier proceedings; and thus, as defined, and limited, by the Court of Appeals, the doctrine of

collateral estoppel does not serve to bar this action. We therefore conclude that the basis upon which the lower court granted the motion for directed verdict was inappropriate.

The theory that is appropriate, and that does serve to preclude this action, is that known as "collateral attack". A collateral attack is "an attempt to impeach the judgment by matters dehors the record, before a court other than the one in which it was rendered, in an action other than that in which it was rendered; and attempt to avoid, defeat, or evade it, or deny its force and effect, in some incidental proceeding not provided by law for the express purpose of attacking it . . . ." 49 C.J.S. *Judgments,* § 408. In simple terms, C.J.S. notes (also § 408):

> "In other words, if the action or proceeding has an independent purpose and contemplates some other relief or result, although the overturning of the judgment may be important or even necessary to its success, then the attack on the judgment is collateral."

The law, long ago, developed what Freeman terms a "rule of inhibition" against collateral attacks upon existing judgments. He describes the rule this way: [13]

> "Judgments of a legally organized judicial tribunal, proceeding within the scope of its allotted powers, and possessing the requisite jurisdiction over the subject matter of the suit and the parties thereto, whether correct or erroneous, cannot be called in question by the parties or privies in any collateral action or proceeding."

This bar against the collateral attack upon subsisting judgments is, of course, critical to the effectiveness of the judicial system itself, and it has long been applied by the Maryland courts. *See, for example, Ranoul v. Griffie,* 3 Md. 54 (1852), and cases cited therein at page 60; also *Fisher, Admrx. v. DeMarr,* 226 Md. 509 (1961).

---

13. Freeman on Judgments, 5th Ed., Vol. 1, § 305, p. 603.

The prohibition against collateral attack upon a judgment, as noted earlier in this Opinion, is related to, but yet quite different from, the effect of estoppel by judgment (direct or collateral). Estoppel by judgment comes into play when a person seeks not to attack the existence or validity of a judgment or decree, but rather to question the effect of that judgment or decree upon him. Conceding that the judgment exists and is valid, he asserts that it does not apply to or settle the issues sought to be litigated in the subsequent proceeding. This, as we have explained, the law does not permit because, if the person was a party to the earlier proceeding (or stands in privity with such a party), he is bound by the existing judgment and by the adjudications upon which it is based. The prohibition against collateral attack, on the other hand, prevents a person from challenging the validity of the existing judgment — from attacking the judgment itself rather than merely its scope or effect. Freeman expresses the distinction thusly: [14]

> "But while res judicata [15] is concerned only with the effect of final judgments and with their effect assuming them to be valid and enforceable, collateral attack includes judgments and orders of all kinds without regard to their finality and is concerned with the circumstances under which and the extent to which they may be impeached and shown to be invalid."

See also 46 Am.Jur.2d Judgments, § 399.

Appellant is not attempting here to vitiate the earlier proceedings — to recover the land or the chattels, to annul the deficiency decree or the confessed judgment, to expunge anything from the dockets or records of the Circuit Court for Wicomico County. He seems content to allow those judgments and decrees, and the actions taken in execution of them, to stand. He does not challenge the jurisdiction of the court or

14. Freeman, op. cit., note 13, Vol. 2, § 630, p. 1328.

15. Freeman apparently uses the term "res judicata" as including both direct and collateral estoppel — i.e., as equivalent to the phrase "estoppel by judgment".

the facial regularity of the prior proceedings. His contention is that the earlier proceedings were wrongfully — tortiously, fraudulently — brought; and, for that reason, he seeks civil damages against those whom he accuses as the tortfeasors — the successful suitors in the prior proceedings and their attorneys.

The law is clear, and quite well settled, however, that such an action nevertheless amounts to and is regarded as a collateral attack upon the prior judgments themselves, and is generally prohibited. Perhaps the clearest, and one of the earliest, statements of this application of the rule is contained in *Nicholson v. Nicholson,* 15 N. E. 223 (Ind., 1888), where, quoting from the then-current edition of Freeman on Judgments (§ 289), the Court held, at page 226:

> " 'The settled policy of the law forbidding that a matter once adjudicated shall be again drawn in issue while the former adjudication remains in force, does not permit the prosecution of an action for obtaining judgment by false and fraudulent practices, or by false and forced evidence. Neither can a party against whom judgment has been recovered sustain an action against his adversary and the witnesses for damages occasioned by their conspiring together and procuring a judgment by fraud, as long as the judgment remains in force unreversed, because the charges made in the second action are conclusively negatived by the former adjudication.' " [16]

The rule announced in *Nicholson* has been generally followed wherever the question has arisen. *See, for example,*

---

**16.** *Nicholson* involved an action for damages by a woman against her former husband. Her complaint was that he had fraudulently obtained a divorce without providing alimony. The Court noted, at page 225: "It is contended, however, that even though the appellee may be barred from setting aside the judgment because of her inexcusable delay, she may nevertheless recover damages for the injury which she sustained on account of the fraud practiced upon her by the appellant, in obtaining an inequitable and injurious judgment against her. Hence, it is said the complaint is maintainable as a suit for damages. This position is wholly inadmissible."

*Shultz v. Shultz,* 36 N. E. 126 (Ind., 1894); *Epstein v. Mittelman,* 160 A. 2d 368 (Del., 1960); *Fishman v. Alberts,* 72 N.E.2d 513 (Mass., 1947); [17] *Risman v. Krupar,* 186 N. E. 830 (Ohio, 1933); *Hanna v. Allen,* 279 P. 1098 (Wash., 1929); *Horner v. Schinstock,* 101 P. 996 (Kan., 1909); *Hall v. Hall,* 100 A. 441 (Conn., 1917); *Purdy v. Winters' Estate,* 156 P. 285 (Or., 1916); *Gerini v. Pacific Employers Ins. Co.,* 80 P. 2d 499 (Cal., 1938); *Droppleman v. Horsley,* 372 F. 2d 249 (10th Cir., 1967). *See also* 49 C.J.S. Judgments, § 411; Freeman on Judgments, 5th Ed., Vol. 1, § 314. Although it does not appear that the Maryland Court of Appeals has spoken directly on this subject, it would seem from its decision in *Schaub v. O'Ferrall,* 116 Md. 131 (1911), that the Court would follow the well-established rule. *See Maicobo Investment Corporation v. Von Der Heide,* 243 F. Supp. 885, 892 (D. Md., 1965).

Precedent aside, the very rationale for the rule prohibiting collateral attack demands its application to this type of proceeding. We have here a situation in which actions were brought by persons facially entitled to bring them, in a court possessing both jurisdiction and venue, against persons properly served with process. After consulting with counsel the defendants made no effort to defend the actions, but instead allowed matters to proceed in their normal and predictable course. Yet, a year or more later, a person in privity with these same defendants asserts the right to sue the parties who successfully prosecuted the earlier actions upon grounds that, if raised and proved in those earlier actions, would have averted most, if not all, of the damage allegedly suffered by virtue of those actions. If this be permitted, the law would sanction by indirection what it plainly does not permit to be done directly. Estoppel by judgment and the prohibition against collateral attack would quickly become empty and meaningless terms, and those bedrock concepts in the law that they are designed to protect — indeed whose protection is their sole *raison d'être* — would soon crumble.

---

17. "The suit comes within the general principle that one cannot, while a judgment or decree continues in force and effect, recover damages alleged to be due to the fraud that led to the rendition of the judgment or the entry of the decree." 72 N.E.2d at 514.

Accordingly, by both force of logic and weight of authority, we conclude that this action amounts to a collateral attack upon the judgments and decrees entered by the Circuit Court for Wicomico County, and that it is therefore subject to the rule prohibiting such attacks.[18]

Unfortunately, this conclusion alone does not dispose of the case, as appellant seeks to come within an exception to the rule.

Freeman draws a narrow distinction in terms of the operation of the rule depending upon whether the person seeking to attack the existing judgment was a party or a stranger to the proceeding from which it arose. Quoting in part from *Safe-Deposit & Trust Co. v. Wright,* 105 F. 155 (3rd Cir., 1900), he states, in § 318:

> "But whenever a judgment or decree is procured through the fraud of either of the parties, or by the collusion of both, *for the purpose of defrauding some third person,* he may escape from the injury thus attempted by showing, even in a collateral proceeding, the fraud or collusion by which the judgment or decree was obtained. The fraud, however, *must be such as directly affects him.* 'The debtor or defendant in a judgment will be allowed, in a proper proceeding, to show fraud, as against himself, practiced by plaintiff on obtaining the judgment; but such fraud against the debtor or defendant, merely, will not avail third parties, such as the holders of junior judgments, for the purpose of affecting the lien of the prior judgment. The fraud that can be taken advantage of by third parties *must be such as affects them;* that is the entry or obtaining the judgment sought to be impeached must be a fraud upon the interests or rights of such third parties, whether it be a fraud on the defendant or debtor or not.' " (Emphasis supplied.)

---

**18.** Perhaps the pragmatic aspects requiring the application of the "collateral attack" doctrine also would justify and make more rational the otherwise tenuous application of direct estoppel, discussed *supra.*

The answer to appellant's attempt to come within this narrow exception lies in the very language used to express the exception. As we pointed out earlier, in his most insulated status, a trustee in bankruptcy succeeds to the rights of a secured creditor as of the date of the bankruptcy. We are unable to find in the record any evidence from which the jury could have concluded that the actions of the Drydens, Whitehead, or his law firm in instituting and prosecuting the four actions in Wicomico County amounted to a fraud upon the trustee, or upon those secured creditors (real or fictional) to whose rights he succeeded. As Freeman makes clear, proof that the Parsonses were defrauded would not suffice. *See also Fisher, Admrx. v. DeMarr, supra,* 226 Md. 509, 519.

Because the rule prohibiting collateral attack is applicable, in addition to the apparent application of direct estoppel, the court's action in entering judgment for appellees was not in error.

> *Judgments affirmed; appellant to pay the costs.*