**In re Evelyn BRADLEY, Debtor.**

**CASHMAN INVESTMENT CORP., Plaintiff,**

v.

**Gilbert ROBINSON, Trustee in Bankruptcy, and Evelyn Bradley, Defendants.**

**Bankruptcy No. LA 83–19403–JA.**

**Reference No. M3–1982–JA.**

United States Bankruptcy Court, C.D. California.

March 7, 1984.

Leon L. Vickman, Encino, Cal., for plaintiff.

Masuda, Jenzaki, Osajima & Nishimora, Los Angeles, Cal., for debtor/defendant.

Gilbert Robinson, Robinson, Wolas & Diamant, Los Angeles, Cal., trustee.

## MEMORANDUM OF DECISION

JOHN D. AYER, Bankruptcy Judge.

Evelyn Bradley is a secretary who lives in southwest Los Angeles. In May, 1982, she gave a third trust deed on her home to HRL Construction, Inc., together with an installment contract to pay $8,901 plus interest over 10 years. Apparently, these were assigned to Cashman Investment Corporation. She never made a payment on the loan. She did, however, on August 30, 1982, file a petition for relief under Chapter 13 of the Bankruptcy Code. The petition was dismissed on March 4, 1983. On April 21, 1983, she filed a second Chapter 13 petition, which was dismissed on June 9, 1983. In August, 1983, she filed a third petition which was dismissed on November 29, 1983. Meanwhile, on November 17, 1983, she filed a petition for relief under Chapter 7 of the Bankruptcy Code. This fourth case is pending before me now.

Ms. Bradley's multiple filings have contributed to a bankruptcy boom. As of March 30, 1983, (the latest date for which figures are available) the number of bankruptcy cases pending in the Central District of California was 55,032. That was a 48.7 percent increase from the previous year. It was an increase of 354.25 percent from 1978. It is nearly double the number of all business cases (30,528) or the number of Chapter XIII cases (30,185) filed in the entire nation during 1977–78. It is almost as great as the number of cases filed in the entire nation in 1954–55 (59,404).

In not one of her four cases did Ms. Bradley receive a discharge. The first three were dismissed too soon, and this fourth is still pending. In each case, however, she received the protection of the automatic stay forestalling, *inter alia,* Cashman from exercising its power of sale pursuant to the deed of trust. *See* 11 U.S.C. § 362 (1982). Cashman sought and got relief from the automatic stay in the first and also in the second Chapter 13 action. Not having gone to trust deed sale at the time of the fourth filing, Cashman began this third stay action before me.

It used to be said that a dominant purpose of bankruptcy law was to provide for and protect the debtor's discharge. *Local Loan Co. v. Hunt,* 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934), *Shelby v. Texas Improvement Loan Company,* 280 F.2d 349 (5th Cir.1960), *Hardie v. Swafford Bros. Dry Goods Co.,* 165 F. 588 (5th Cir. 1908), *see generally* REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, H.R. Doc. No. 137, 93d Cong., 1st Sess. 33–59 (1973) (causes of bankruptcy). No doubt that is still true. But cases like this one make it clear that the world is changing. Seemingly more and more debtors are resorting to the bankruptcy courts with no particular thought of a discharge, but rather seeking the protection of the automatic stay.

There is, of course, no mystery as to why debtors only now have begun to utilize the automatic stay. The reason is that the stay is, for present purposes, largely new. In its current form, it came in with the Bankruptcy Code of 1978, *codified as* 11

U.S.C. (1982). By any measure, the new stay greatly expanded the protection available to the debtor under bankruptcy law. As with any new mechanism, the stay presents, to the public, the bar and the courts, a new range of problems and possibilities. Together we are creating a new set of conventions as to what is permissible under this new device. In this case, Cashman argues that Ms. Bradley has exceeded the bounds of the permissible. Cashman asks that I grant relief from the stay. But Cashman asks more. Cashman asks for a range of related remedies calculated either to sanction the debtor for past multiple filings, or to assure that she does not further forestall foreclosure by filing again.

I think Cashman has presented me with an important and largely unexamined problem. On the record as presented, I hold, first, that Cashman's relief from the stay in prior proceedings is res judicata for this case. I therefore grant relief from the stay. Further, I enjoin Ms. Bradley from filing any new proceeding of any sort for a period of six months, except with the prior permission of a bankruptcy judge. Because of the importance of this issue in the Central District, it may be useful to try to set forth my thoughts at length.

### The Stay

Novel as it may be, the stay has deep roots. The Bankruptcy Act of 1898 stayed lawsuits on dischargeable claims. *See* Bankruptcy Act of July 1, 1898 § 11, 30 Stat. 544. Case law very early protected property *in custodia legis*. *Ex parte Christy*, 44 U.S. (3 How.) 292, 11 L.Ed. 603 (1845) (per Story J.). From these beginnings, the stay over the past half century has gone through a process of incremental extension. There are a number of episodes of which three are worth noting. The first was the extension of the stay, in reorganization proceedings, to property not *in custodia legis*. *Continental Bank v. Rock Island Ry.*, 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935). The second was the move from a discretionary stay, dependent on judicial action, to a stay that was wholly self-executing. *See* § 75(*o*) of the Bankruptcy Act of 1898, *as amended by* Act of Mar. 3, 1933, 47 Stat. 1467 (actions against farmers automatically stayed) (ended by its own terms 1949), *reprinted in* 10 COLLIER ON BANKRUPTCY 1833 (14th ed.); § 148 of the Bankruptcy Act of 1898, *as amended by* Act of June 22, 1938 (Chandler Act), 52 Stat. 840 (automatic stay of actions in corporate reorganizations upon court approval of petition) (superseded 1978), *reprinted in* 6 COLLIER ON BANKRUPTCY 1086 (14th ed.); Bankr. Rule 10–601 (implemented § 148, *id.*) (superseded 1983), *reprinted in* 13 COLLIER ON BANKRUPTCY ¶ 10–601.03 (14th ed.). The third was the extension and generalization of the stay, under the Bankruptcy Rules, from corporate reorganizations (Chapter X under the 1898 Act) to other methods of nonliquidation relief. *See* Bankr.Rule 11–44 (arrangements for payment of unsecured debt) (superseded 1983), *reprinted in* 14 COLLIER ON BANKRUPTCY at Ch. 11–44 (14th ed.); Bankr. Rule 12–43 (real property arrangements by persons other than corporations) (superseded 1983), *reprinted in* 14A COLLIER ON BANKRUPTCY at Ch. 12–43 (14th ed.); Bankr.Rule 13–401 (wage earners' plan) (superseded 1983), *reprinted in* 15 COLLIER ON BANKRUPTCY at Ch. 13–401 (14th ed.). But none of these rules was as extensive as the rule reserved for corporate reorganizations under former Bankruptcy Rule 10–601, *supra*. And in straight bankruptcy, the protection was narrower still. *See* Bankr.Rule 401 (superseded 1983), *reprinted in* 12 COLLIER ON BANKRUPTCY at Ch. 401 (14th ed.); Bankr.Rule 601 (superseded 1983), *reprinted in* 13 COLLIER ON BANKRUPTCY at Ch. 601 (14th ed.). In any event, all this was swept away by the single, comprehensive stay of Section 362, 11 U.S.C. § 362 (1982).

From this history, it is possible to discern a number of purposes for the automatic stay. Much of the early case law asserted the power, sometimes said to be inherent, to protect the dignity and authority of the equity court. *Ex parte Christy*, 44 U.S. (3

How.) 292, 11 L.Ed. 603 (1845); *In re Tyler*, 149 U.S. 164, 13 S.Ct. 785, 37 L.Ed. 689 (1893); *Julian v. Central Trust Co.*, 193 U.S. 93, 24 S.Ct. 399, 48 L.Ed. 629 (1904); *cf. Diners Club v. Bumb*, 421 F.2d 396 (9th Cir.1970). Other purposes may be more peculiar to bankruptcy law. For example, the stay is said to prevent "a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts." *Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47, 55 (2d Cir.1955); *see In re Holtkamp*, 669 F.2d 505 (7th Cir.1982). And this proposition, itself frequently echoed, may itself conceal a number of other purposes. For example, it may represent a policy of imposing a "bankruptcy priority" scheme, rather than letting the assets go to the swift, the lucky, or the aggressive. *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941); *Canright v. General Finance Corp.*, 35 F.Supp. 841 (E.D.Ill.1940). Or it may represent a policy of retaining going-concern values to maximize the total return available to creditors generally. *In re C.F. Simonin's Sons, Inc.*, 28 B.R. 707 (Bkrtcy. E.D.N.C.1983); *In re Inforex*, 10 B.R. 497 (Bkrtcy.D.Mass.1979).

But there is another discernable purpose, not specifically recognized in any of the above. That is the goal of permitting the debtor to *hold on* hoping for better times. However primitive as this may appear on the surface, it is quite clearly an established policy of bankruptcy law. Thus a seminal source, discussing the roots of modern bankruptcy law, recalls: "the nadir of the depression found debtors either temporarily handicapped by frozen assets or at least temporarily insolvent, due to artificial low-price levels resulting from an oversupply of goods caused by an almost total lack of demand." *Receivership and Bankruptcy Proceedings in United States Courts* (The Jackson Report), Sen.Doc. No. 268, 74th Cong., 2d Sess. 2 (1936).

In this perspective, it may be helpful to recall that the first truly broad-gauge, self-executing automatic stay occurs not in the Bankruptcy Act of 1978, and not in Chapter X of the Chandler Act, but in Section 75 of the Bankruptcy Act of 1898, *as amended by* Act of Mar. 3, 1933, 47 Stat. 1467, *reprinted in* 10 COLLIER ON BANKRUPTCY 1833 (14th ed.), designed to protect debt-ridden farmers against mortgage foreclosure. Section 75 by its language purported to permit a broad range of debtor relief, but there is little doubt that a dominant purpose was simply to permit the debtor to keep his creditors at bay. *See generally* Hanna, *Agriculture and the Bankruptcy Act*, 29 Minn.L.Rev. 1 (1934); Diamond & Letzler, *The New Frazier-Lemke Act: A Study*, 37 Colum.L.Rev. 1092 (1937); Letzler, *Bankruptcy Reorganization for Farmers*, 40 *id.* at 1133 (1940). One adverse critic, reviewing lower court decisions, estimates that "total delays of six to eight years [were] not uncommon." *See* W. Hanna & J. MacLachlan, CREDITORS' RIGHTS AND CORPORATE REORGANIZATION 301–02 (1957). The Supreme Court upheld the constitutionality of a (revised) agricultural debt relief act in 1937, *Wright v. Vinton Branch of the Mountain Trust Co.*, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736. Earlier, in *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934), the Supreme Court had upheld a comparable state mortgage moratorium law, similar chiefly in that its dominant purpose appears to have been to give the debtor more time in the face of threatened foreclosure.

The automatic stay, then, for all its novelty, rests on a very well-articulated tradition. Taking it all together, it seems possible to infer a couple of propositions. First, the legislature has envisioned, and the courts have supported, a number of different purposes for the automatic stay. Second, among the range of possible purposes, the goal of sheer delay may, under the right circumstances, be one.

Having said that, however, it is still necessary to recognize the novelty of the stay in the current situation. Nothing in our history can equal for its universality and comprehensiveness the automatic stay of Section 362. Inevitably, so radical a

change in law was bound to change bankruptcy practice in ways the drafters could hardly have foreseen. One result is what we see here: repeated filings to fend off the same action from the same creditor. At least until recently, there was no bar against repeated filing, and the reason was simple enough: at least until recently, it did not make any sense.

### Res Judicata

Faced with this novel situation, Cashman argues, *inter alia*, that the decisions granting relief from the stay are res judicata in this case. I agree.

As the commentators explain, the notion of res judicata comprises a number of particular propositions. *See* C. Wright, A. Miller and E. Cooper, FEDERAL PRACTICE AND PROCEDURE § 4401 (1981). One such proposition may be stated as follows: res judicata precludes a defendant from raising, in a second action, defenses that would have been equally available to her in a prior action. Id. at § 4414. For example, in *Klein v. Whitehead*, 40 Md.App. 1, 389 A.2d 374 (1978), the creditor in the original action sought foreclosure of a mortgage. After the creditor won the foreclosure action, the debtor brought a separate action alleging conspiracy, breach of fiduciary duty, and the like. The Court properly held that the second action was precluded by the judgment in the first action. To the same effect *see Lovely v. Laliberte*, 498 F.2d 1261 (1st Cir.1974) (judgment of eviction; subsequent action alleging malicious and unconstitutional use of state process), *cert. denied*, 419 U.S. 1038, 95 S.Ct. 526, 42 L.Ed.2d 316; *Moore v. Harjo*, 144 F.2d 318 (10th Cir.1944) (judgment quieting title; subsequent action alleges title by prescription); *Circle v. Jim Walter Homes, Inc.*, 654 F.2d 688 (10th Cir.1981) (explaining *Moore* ).

■ The issues in these opinions bear a strong resemblance to the issues that might arise in the context of a typical bankruptcy case. The results are all unobjectionable and they seem to support Cashman's view of the case. But there is an important limitation here, and that is this: the defense, in order to be barred, *must have been available* at the time of the first action. A party cannot be barred by res judicata from raising defenses that did not exist at the beginning of the case. *See United States v. Villanueva*, 453 F.Supp. 17 (E.D.Wash.1978) (in a second foreclosure action, debtor may assert noncompliance with administrative regulations, where regulations did not exist at time of first foreclosure).

It is easy enough to imagine this problem in a bankruptcy context. Suppose the debtor files a Chapter 11 proceeding to stay a foreclosure on his home. The creditor brings on a motion seeking relief from the stay. The court grants relief, basing its decision on a finding that there is no equity in the property and that it is not necessary for an effective reorganization. *Cf.* 11 U.S.C. § 362(d)(2) (1982). Suppose the debtor thereafter brings himself current on his mortgage payments and the creditor abandons his foreclosure. Suppose, however, that a year later the debtor again defaults and files a new Chapter 11. Suppose finally that by virtue of a change in market conditions, there is now a substantial equity in the property. In a new motion for relief from the stay, brought by the same creditor, is the prior ruling res judicata? On the authority of *Villanueva*, it would appear that the answer would have to be "no." The debtor could not rely on his equity in the prior proceeding because the issue (together with the equity) simply was not available at the time. On accepted res judicata principles, it would seem that the debtor should be able to make an issue of equity, and the creditor should not be able to rely on the prior ruling.

### Bankruptcy Authority

Treating the matter as a problem of res judicata, let me turn now to the authorities on multiple filing of bankruptcy cases. As will be evident, the cases rarely deal with the matter as a res judicata problem (*but cf. In re Bystrek*, 17 B.R. 894 (Bkrtcy.E.D.

Pa.1982)). I think the cases are nonetheless largely consistent with a res judicata approach.

Perhaps the most useful discussion comes from the Second Circuit, deciding *In re Johnson (Johnson v. Vanguard Holding Corp.),* 708 F.2d 865 (1983). On December 7, 1981, the debtor filed a Chapter 13 plan (sic—the Court does not speak of the "case," only of the "plan"), forestalling a threatened foreclosure on her home. The plan was confirmed, but the debtor failed to make the payments and the plan was dismissed on March 1, 1982. Acting through the same attorney, she filed a second plan on May 5, 1982. The mortgagee moved for dismissal or conversion. The debtor offered testimony that her circumstances had changed, but Bankruptcy Judge Parente refused to hear it. He held that the second filing was an abuse of the system, without regard to any alleged change in circumstances, and granted the mortgagee's motion. The Court of Appeals reversed, holding that "the Bankruptcy Judge should determine whether *Johnson* had a bona fide change in circumstances." *Id.* at 868.

Lower court authority in the First and Third Circuits seems generally, but not entirely, consistent with *Johnson*. *In re Roderick,* 20 B.R. 485 (Bkrtcy.D.R.I.1982), seems clearly in accord. The debtors filed a Chapter 13 on the day of a scheduled foreclosure. It was later converted to Chapter 7, and the debtors received a discharge. Thereafter, less than one hour before a newly scheduled foreclosure sale, the debtors filed a second Chapter 13 petition. Bankruptcy Judge Votolato dismissed the petition as not filed in good faith. The Court specifically refused to hold that repeat filing was bad faith *per se.* In this case, however, the Court said that "the evidence is clear that the Debtors filed neither of their Chapter 13 petitions with the intention of making meaningful payments to unsecured creditors as contemplated under Chapter 13." *Id.* at 486.

Also possibly consistent with *Johnson* is *In re Conway, (Latimer & Buck Mortgage Co. v. Conway),* 5 B.R. 251 (Bkrtcy.E.D.Pa. 1980). The Court there held that filing of two previous Chapter 13 petitions is not alone just cause for dismissal of a third. Somewhat further afield is *In re Bystrek,* 17 B.R. 894 (Bkrtcy.E.D.Pa.1982), where the Court held without qualification that relief from the prior stay was res judicata in a new proceeding. But *Bystrek* may be consistent with *Johnson* on its facts. In *Bystrek,* the debtor filed a Chapter 13 petition one day before a sheriff's sale. The creditor obtained judgment for relief by default. The Chapter 13 was dismissed on motion of the trustee. The debtor filed a new Chapter 13, two days before another sheriff's sale. The Court held counsel in contempt and ordered him to pay the creditors' attorney's fees. "Although the law grants a generous measure of relief to debtors, this benefit is not gratuitous. The law also imposes a measure of responsibility." *Id.* at 895. The Court does not discuss the possibility of changed circumstances. But no one appears to have suggested that there were any changed circumstances. It seems entirely conceivable that the Second Circuit, on this record, would also have found that the second filing was improper.

### Ms. Bradley's Case

■ Taking the matter in this context, it is in order now to consider whether the relief in the prior cases should be treated as res judicata for this case. As it happens, neither Ms. Bradley nor her counsel appeared at the hearing on relief from stay in this case, so I could let the matter go by default. Nonetheless, I have reviewed the files in all four cases. I find that there has been no material change of circumstances since the beginning of the case, and on that basis I find that the prior decisions on relief are res judicata in this case.

In each of the four cases, Ms. Bradley listed only four creditors—three trust deed holders (including Cashman) and one unsecured claimant. The accounting of the liability to Cashman does not tally, but Ms. Bradley does appear to concede that she

has made no payments on the loan. On all petitions, Ms. Bradley estimates the value of the property at $80,000. One place where differences do occur is in her Chapter 13 budgets. The first and second show income of $760 a month and expenses of $1,183.60 a month. In other words, she was $423.60 short of her minimum survival budget, without even considering repaying on arrearages. On these numbers, it is hard to comprehend why counsel attempted a Chapter 13 at all.

Interestingly, the third Chapter 13 tells a somewhat different story. It shows monthly expenses reduced to $1,003, but it shows income *increased* to $1,445, with the additional notation of $700 from a "part-time job." It is tantalizing to speculate on how I should have ruled had this proceeding come before me in that case. Unfortunately, for whatever reason, she dismissed that Chapter 13 and brought this new Chapter 7 petition instead.

For whatever it may be worth, I think it would be in poor taste, to put it mildly, for me to get indignant about Ms. Bradley's conduct in this case. Ms. Bradley appears to be the mother of three small children, and it also appears that she has lived in her home for 14 years. Under these circumstances, I confess I have to admire her persistence in trying to keep her home. But taking all that into account, it seems to me the decisions on the stay actions in the prior cases ought to be regarded as res judicata for this case.

### The Remedy

As the earlier decisions are res judicata, I grant relief from the stay. Cashman asks me to go further and prescribe a remedy to discourage future filings. Cashman suggests a broad range of alternatives, from denying her discharge through to the imposition of "appropriate sanctions, fines, penalties and custodial orders."

I will not deal with Cashman's numerous suggestions in detail. Denying the discharge seems to me clearly excessive in this action for relief from the stay, although perhaps I should consider it on appropriate facts in a specific discharge proceeding. Other suggestions also may be appropriate in particular cases. For this case, however, I think the proper approach is as follows: I will enter an order enjoining Ms. Bradley from filing a future bankruptcy proceeding for six months, except with leave of the court.

There is authority for this approach. The Ninth Circuit affirmed a bar against subsequent filing in *In re Springpark Assoc.*, 623 F.2d 1377 (1980). *Springpark* may differ in that the bar was the fruit of a stipulation, not a judgment. And in any event, the former filing and the latter were so closely linked that there was no possibility of changed circumstances. *See generally* C. Wright, A. Miller and E. Cooper, FEDERAL PRACTICE AND PROCEDURE § 4443 (1981). Still the appellate court seems clearly to have found that a bar is not out of the question. *See also Wood v. Santa Barbara Chamber of Commerce*, 705 F.2d 1515 (9th Cir.1983); *cf.* 11 U.S.C. § 105 (1982); *In re Wong*, 30 B.R. 87 (Bkrtcy.C.D.Ca.1983).

Further support for this approach is offered by the Code's treatment of a related problem. That is the impact of a dismissal on the debtor's right to a discharge. The matter is dealt with by Bankruptcy Code Section 349, in a manner consistent with *Johnson, Springpark* and its kin. Section 349 provides that dismissal is without prejudice to a later discharge, "unless the court, for cause, orders otherwise." 11 U.S.C. § 349 (1982); *see generally* H.R. Rep. No. 595, 95th Cong., 1st Sess. 338 (1977) (legislative history); S.Rep. No. 989, 95th Cong., 2d Sess. 48 (1978) (legislative history), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5834, 6294. As Collier construes it:

> The primary thrust of section 349 is the establishment of the general rule that the dismissal under title 11 is without prejudice.... [However,] the court is given the discretion to order otherwise. Thus, when dismissal is predicated on grounds that would justify barring the debtor from discharge in the dismissed

case or in a subsequent case the court has the power to dismiss a case *with* prejudice.

2 COLLIER ON BANKRUPTCY ¶ 349.02 (15th ed.).

Section 349, drawing on former Bankruptcy Rule 120, reverses an older policy, which is said to have "often operated harshly against the bankrupt." Advisory Committee Note to former Bankr.R. 120, *reprinted in* 12 COLLIER ON BANKRUPTCY ¶ 120.01 (14th ed.). Collier goes on to caution, however, that the rule of Section 349

> must be limited by the requirement of due process. Accordingly, the courts should proceed with caution in the area, and dismiss with prejudice only when the debtor's conduct is particularly egregious and only after full opportunity for a hearing similar to the opportunity provided on a complaint under section 727 for denial of discharge.

2 COLLIER ON BANKRUPTCY ¶ 349.02 (15th ed.).

Bankruptcy Judge King cited Section 349 in a multiple-filing case, holding a debtor in contempt for violating a prior order of dismissal which specifically precluded subsequent filing. *In re Petro*, 18 B.R. 566 (Bkrtcy.E.D.Pa.1982). With all of the above, *compare* FED.R.CIV.P. 41 (on dismissal with, or without, prejudice), and 9 C. Wright, A. Miller and E. Cooper, FEDERAL PRACTICE AND PROCEDURE § 2367 (1981) (dismissal without prejudice "subject to the usual rules of *res judicata*").

While I think an injunction is proper, still I think it is important to limit the injunction to six months, and to permit an exception with leave of the Court. As I suggested above, the legislative intent behind the automatic stay appears deeply rooted and clearly articulated. I do not think I should completely debar a debtor from the protection of the stay when there is this less intrusive means of addressing the problem.

The practical consequence of this order is that it shifts the burden of proof from creditor to debtor; the debtor must make some preliminary showing before she may get the protection of the stay. Failure to get permission may be grounds for a finding of contempt. Since this injunction takes the form of a specific order, directed at the debtor, she will be unable to plead her ignorance of the intricacies of bankruptcy law as a defense. Since it is present on the record in this case, any attorney representing her in a subsequent proceeding will have to show that he did not and could not have known of the order; else he also may be liable for sanctions. *Cf. In re Bayport Equities Corp. (Pasadena Thrift and Loan Association v. Bayport Equities Corp.)*, 36 B.R. 575 No. SA 83–04600 PE (Bkrtcy.C.D.Cal. filed Nov. 28, 1983); Bankr. Rule 9011 (1983); 28 U.S.C. § 1927 (1976).

Even this injunction trenches on bankruptcy policies, however. Hence, I am unwilling to issue it in the ordinary case. I intend to reserve it for situations (such as the present case) where there is reason to expect abuse.

### Summary

 In summary, I believe the problem of multiple filing should be dealt with as a problem of res judicata. I believe the debtor/defendant in a stay action should be precluded from raising in a subsequent action any defense that he could have raised in a prior action. On this basis, I grant relief from the stay. On the other hand, I think the debtor ought ordinarily be free to invoke the stay in a new case when his circumstances have changed. I believe that the behavior in this case creates an inference that the debtor intended to abuse the bankruptcy process. Hence, I am willing on the facts to enjoin the debtor from any subsequent filing for six months, save on express permission of the court. I would anticipate that any violation of this order would be amenable to sanction as a contempt. I should add that I do not suppose that this is any comprehensive solution to the multiple-filing problem. I assume that any comprehensive solution must emanate from the legislature.

I am advised that my colleagues, Judges ASHLAND, ELLIOTT, LASAROW, PAGTER and PHELPS, join me in this opinion.