545 A.2d 81

Martine SCOTT

v.

**PRINCE GEORGE'S COUNTY DEPARTMENT OF SOCIAL SERVICES, et al.**

**No. 1382, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

Aug. 4, 1988.

Certiorari Denied Nov. 29, 1988.

Jayson Amster, Upper Marlboro, for appellant.

Margaret G. McHale, Riverdale, for appellees John and Lilly Scott.

Kathleen A. Morse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee Prince George's County Dept. of Social Services.

Argued before ALPERT, ROSALYN B. BELL and WENNER, JJ.

ROSALYN B. BELL, Judge.

Martine Scott appeals a decision of the Circuit Court for Prince George's County which terminated all her legal rights as the parent of John and Lilly Scott, twins born to Ms. Scott on November 25, 1980. On June 4, 1987, the circuit court, pursuant to Md.Fam.Law Code Ann. § 5–313 (1984), granted the Prince George's County Department of Social Services' (Department) petition to terminate Ms. Scott's rights, finding that the Department proved by clear and convincing evidence that it was in the twins' best interest that all legal and physical ties to their natural mother be severed.[1] We affirm the circuit court's decision.

---

**1.** The grant of such a petition enables the Department to place the twins for adoption. Parental consent is required unless the parents' rights have been terminated pursuant to § 5–313, which provides in pertinent part:

Ms. Scott presents us with three issues to resolve. Specifically, she contends:

—She was denied due process of law because, contrary to the doctrine of res judicata and/or collateral estoppel, the trial court considered evidence from an earlier unsuccessful termination of parental rights trial to meet the constitutionally required level of clear and convincing evidence.

—She was denied her due process right to a fair trial because of the cumulative adverse effect of several erroneous evidentiary rulings.

—She was denied due process because the evidence did not support the trial court's determination that it was in the best interest of her children to terminate her parental rights.

—Background—

Martine Mwenda (Martine Scott)[2] met Ronald Lewis Scott, the twins' father, in 1978. Martine Scott turned out to be a lady of mystery, apparently connected to several foreign embassies. Their relationship blossomed during 1978, 1979 and 1980, with Ronald Scott dividing his time between his wife and Martine Scott. Martine Scott, a frequent traveler, often left the country for trips to Europe and Africa. She appeared to have an unknown and unlimited source of income and used several different names and birth dates. In 1979, Martine Scott, pregnant with Ronald Scott's unborn son, Ronald, Jr. left the United States. She returned in 1980, informing Ronald Scott that she had left Ronald Jr. with her mother in either Belgium or Africa.

---

"(a) In general.—A court may grant a decree of adoption or a decree of guardianship, without the consent of a natural parent otherwise required by §§ 5–311 and 5–317 of this subtitle, if the court finds by clear and convincing evidence that it is in the best interest of the child to terminate the natural parent's rights as to the child...."

**2.** Ms. Scott also used the names of Martine Van Walgen and Mwenda M'Siri Kikasa.

In 1980, the relationship between Ronald Scott and Martine Scott grew troubled and, according to Ronald Scott, interspersed with frequent fights and Martine Scott's trips abroad. On November 25, 1980, John and Lilly, twins, were born to Martine Scott.[3]

After the birth of the twins, Ronald Scott was an infrequent visitor at Martine Scott's household, but had visited enough to form the opinion that her mothering efforts were careless and sporadic. He also stated that Martine Scott was never satisfied with any of the live-in baby-sitters she had hired. She supported the twins (and for a time Ronald Scott) from an unknown source of income, leading him to believe that her occupation had something to do with the Embassies of Zaire and/or Cameroon since she attended many of their social functions.[4] Ronald Scott stated that Martine Scott was frequently away from home, and wanted only to hire the cheapest baby-sitter she could find. She also practiced what Ronald Scott termed "witchcraft".[5]

On January 28, 1981, Martine Scott, angry with Ronald Scott's lack of interest in the twins, took the infants to his job and left them with him. He took them to the personnel office, indicating that he had no idea who they were.[6] The

---

3. According to Ronald Scott, Martine Scott told him that she had become pregnant so that he would marry her, thus allowing her to remain in this country legally.

4. There was much discussion in the case *sub judice* about Martine Scott's involvement with the importation of controlled dangerous substances, but the only proof which substantiated these allegations was Martine Scott's conviction of drug-related charges in the District of Columbia in 1982.

5. Mr. Scott stated that she once threw salt around the house to remove the evil spells left by a dead deer she had found on the front lawn. He also stated she often filled glasses with water in a candle-lit room, and then placed sharpened knives into the water.

6. A paternity decree determining that Ronald Scott was the father of the twins was issued on February 16, 1982, and he was ordered to pay $50 a month for their support. He gave up all parental rights on June 17, 1983, as well as any support obligations, by consenting to their adoption.

police were called and the twins were turned over to the Department.

After a hearing on January 30, 1981, the Prince George's County Juvenile Court committed the infants to the Department's care. The Department placed them in a temporary foster home. On February 17, 1981, the Department returned the twins to Ms. Scott, but continued to provide some assistance.[7] In June 1981, the Department closed the case, finding that the children were not at risk. Martine Scott refused the Department's offer of further aid. Later that summer, the Department received reports that Martine Scott had left the infants in a hot car. Near the end of August, apparently angry at the local health department for removing her from its needy families assistance program,[8] Martine Scott deposited the infants at the local health department. She did retrieve the infants a short time later, and while there, intentionally struck one of the local health department workers. The Department reopened the case.

On February 19, 1982, Martine Scott called the Department and asked that it remove the twins from her home. The social worker arranged to visit Martine Scott to discuss her problems. On February 24, Ms. Scott called the Department and stated that she had left the children unattended and that the house key was in the mailbox. A social worker called the police and the twins were removed from the home. The Department sheltered the twins overnight, and after a hearing the juvenile court returned the twins to Ms. Scott. The juvenile court also ordered a psychiatric evaluation of Ms. Scott, which was begun in March by Dr. Joseph

---

**7.** A Department social worker counselled Martine Scott and helped her to obtain financial aid because her electricity had been turned off.

**8.** Martine Scott refused to give the local health department any information about her finances or her status in this country.

Poirier.[9]

On April 22, 1982, the children were again taken by the Department after a C & P Telephone Company employee heard the twins crying. This employee called the police, who found the toddlers unattended, eating food from the floor and wearing extremely dirty diapers. The police also found a large quantity of marijuana in the house and arrested Martine Scott when she arrived home. The juvenile court returned the twins to her in May with the understanding that Martine Scott, who was an illegal alien, would be leaving the country pursuant to a plea bargain in a federal drug case. Ms. Scott was to take the children to Zaire where she had family.

On October 1, 1982, a Prince George's County deputy sheriff went to Ms. Scott's home to serve her with an arrest warrant. He found the twins naked and in the care of a young girl who spoke no English. The house held no food, and Ms. Scott could not be found. The juvenile court once again placed the children in foster care. The Department attempted without success to locate either Ms. Scott or a family member through the Zairian Embassy. In March of 1983, the Department placed the children with a potential adoptive couple.[10]

In August of 1983, having received no word from Martine Scott, the Department filed a petition for guardianship and termination of parental rights, pursuant to Md.Fam.Law Code Ann. § 5–313. A month after filing the petition, the Department received a letter from Ms. Scott dated April, 1983, apparently mailed from Paris, France. Ms. Scott wrote that she was unable to return to the United States, and requested that the twins be sent to her. The Department wrote to Ms. Scott, informing her that her children

---

**9.** Following this hearing, Dr. Poirier asked to be removed from the case because of his lack of success in dealing with Ms. Scott and because of her accusations of sexual improprieties. Dr. Poirier was one of the Department's expert witnesses in the case *sub judice.*

**10.** The twins remained with this foster family until April, 1987.

were being considered for adoption. She replied that she was returning to the United States and that the children were not to be so placed. The Department remained unaware of Ms. Scott's whereabouts until January of 1984, when she was arrested and jailed in Prince George's County for alleged narcotics violations.

While Martine Scott was jailed, the Department made efforts to sustain her maternal relationship with the twins. Ms. Scott did not cooperate in any of these efforts. She refused to disclose the names and addresses of any relatives who could serve as potential foster parents, demanding instead that the children be returned to her.[11] The Department arranged visitation with the children until Ms. Scott was transferred to a District of Columbia prison.[12] She then told the Department to arrange no further visits. She wrote physically threatening letters to the social worker resulting in the social worker's request to be removed from the case.

—First Trial—

In early January of 1985, the Circuit Court for Prince George's County heard the Department's petition to terminate Martine Scott's parental rights, which had been filed by the Department in August of 1983. Martine Scott had been missing for at least nine months. She was able to visit with the four-year-old twins at the courthouse and at the jail. During the trial, she wrote a letter to the trial judge, accusing him of engaging in sexual improprieties with her. On February 4 the circuit court denied the Department's petition to terminate Ms. Scott's parental rights. The trial court, however, issued an order, stating, "I have read all

**11.** It could be inferred that she wanted the children so that she could request an early release from prison in order to care for them.

**12.** Except for an escape in the summer of 1984, Ms. Scott remained incarcerated in local and federal prisons from January, 1984 until January, 1987. She was in the custody of the United States Immigration and Naturalization Service during the trial court proceedings which gave rise to this appeal.

these records, and unless this lady gets her act together, she will never get these children back." The trial court ordered Ms. Scott to engage in private psychological therapy, to disclose her mother's address so that the Department could investigate a possible relative-placement for the twins, to reveal the names and addresses of other family members in Zaire who might serve as potential placements, to maintain contact with the children and the Department, to execute a service agreement [13] with the Department, and, in general, to cooperate with the Department. The Department was ordered to help arrange and pay for Ms. Scott's private psychological therapy and the twins' psychological counselling, to investigate possible placements with blood relatives, to ascertain Ms. Scott's immigration status, to arrange visits between Ms. Scott and the children, and to ensure that communications from Ms. Scott reached the children.

The Department assigned a new social worker to the case—the new social worker had a reputation of being an easy person with whom to get along. It was the Department's hope that this worker would be able to succeed where the others had failed. Pursuant to the court order, the Department had prepared a service agreement and had sent a copy to Martine Scott's attorney at the time, so that he could review the agreement in advance with his client. At the social worker's first visit, Martine Scott became very upset when presented with the service agreement and threatened to shoot and/or kill the social worker.

The Department also presented Martine Scott with a list of all area licensed therapists. The social worker suggested that perhaps Ms. Scott could choose one with her attorney's help, in accordance with the trial court's order. She ada-

---

**13.** A service agreement is similar to a contract, and is used by the Department and parent(s) to specify what each must do to accomplish a particular goal. In the case *sub judice,* the goal was the eventual reunification of Martine Scott with her twins.

mantly refused to select a therapist. She refused to reveal the name and address of her mother.[14] She did not communicate regularly with her children. In fact, Martine Scott refused to discuss *any* of the provisions of the trial court's order with the Department. Because Martine Scott refused to take any steps toward fulfilling the trial court's order, the Department concluded there was no prospect that she would *ever* cooperate with them. The Department filed a second petition to terminate Ms. Scott's parental rights in March of 1986.

—Second Trial—

The trial on the second termination proceeding lasted 22 days. Many of the facts presented by the Department in this trial had been presented at the first trial but to a different judge. The trial court at the second trial admitted this evidence because a complete understanding of what had occurred after the denial of the first petition could only be gained by considering what had *preceded* the petition. In other words, the court allowed the evidence of events from before the first termination trial in order to have a context for subsequent events. The trial court stated:

"[T]he special nature and circumstances of the case presently before it is of such a high magnitude that the entire case must be heard in order that the context in which these events transpired may be properly presented and addressed. Failure to do so would be misleading to the trier of fact in its determination of what is in the best interests of these twins. The Court cannot and will not address these issues in a time-encapsulated vacuum."

At the conclusion of the second trial, the Court granted the Department's petition to terminate Ms. Scott's parental rights.

---

**14.** The Department received no response from inquiries sent to possible relatives in Zaire. No effort was made to contact Ronald Scott, or any of his relatives, probably because he relinquished all parental rights he had by signing an adoption consent decree. *See* n. 6, *supra.*

## CONSTITUTIONAL GUARANTEES
### —Burden of Proof—

■ We are asked to determine whether appellant was denied constitutional due process when her parental rights were terminated at the second trial. Specifically, appellant contends that the trial court, contrary to the doctrine of res judicata, erroneously allowed the Department to use evidence from the first trial to meet its burden of proof in the second. We hold that the trial court was not prevented by the doctrine of res judicata from using this evidence to meet the constitutionally required clear and convincing level of proof. We do not hold today that res judicata could *never* apply to successive termination actions, but rather that here the new evidence showed changed circumstances which justified a changed result.

We begin our explanation by examining due process guarantees in the context of termination of parental rights. Freedom of personal choice in family life matters is a fundamental liberty interest protected by the Fourteenth Amendment of the United States Constitution. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982). This interest has long been recognized by the United States Supreme Court.[15] Therefore, when the State seeks to terminate the relationship between a parent and child, it must use procedures which comport with due process. *Santosky*, 455 U.S. at 753, 102 S.Ct. at 1394, citing *Lassiter v. Department of Social Services*, 452 U.S. 18,

---

**15.** *See Little v. Streater*, 452 U.S. 1, 13, 101 S.Ct. 2202, 2209, 68 L.Ed.2d 627 (1981); *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978); *Smith v. Organization of Foster Families*, 431 U.S. 816, 845, 97 S.Ct. 2094, 2110, 53 L.Ed.2d 14 (1977); *Moore v. East Cleveland*, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (plurality opinion); *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974); *Stanley v. Illinois*, 405 U.S. 645, 651–52, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923).

24–32, 101 S.Ct. 2153, 2158–62, 68 L.Ed.2d 640 (1981).[16] The Supreme Court in *Santosky* emphasized the importance of this interest, stating:

> "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.... When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures."

*Santosky*, 455 U.S. at 753–54, 102 S.Ct. at 1394–95 (footnote omitted).

The question before the Supreme Court in *Santosky* was whether New York State laws,[17] which provided for termination of parental rights upon a finding of permanent neglect supported by a "fair preponderance of the evidence," violated constitutional due process standards. *Santosky*, 455 U.S. at 747, 102 S.Ct. at 1391. The Supreme Court held that "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." *Santosky*, 455 U.S. at 747–48, 102 S.Ct. at 1391–92. The *Santosky* Court found the preponderance standard deficient because it resulted in an almost equal allocation of risk of an erroneous termination between the parent and the State, an allocation the Court found unacceptable because of the importance of the

---

**16.** The Supreme Court held in *Lassiter* that due process did not require that counsel be appointed to represent indigent parents in every parental right termination proceeding. The parent's right to court-appointed counsel is to be determined by the trial court on a case-by-case basis. *Lassiter*, 452 U.S. at 31–32, 101 S.Ct. at 2161–62.

**17.** The state statutes at issue in *Santosky* were N.Y.Soc.Serv.Law §§ 384–b4(d), 384–b7(a) (McKinney Supp.1981–82) (Soc.Serv.Law), and the New York Family Court Act § 622 (McKinney 1975 & Supp. 1981–82).

interest involved. *Santosky,* 455 U.S. at 765–66, 102 S.Ct. at 1401–02.

Maryland's parental right termination statute, Md.Fam. Law.Code Ann. § 5–313, explicitly adheres to this standard of proof by providing that parental rights may only be terminated "if the court finds by *clear and convincing evidence* that it is in the best interest of the child to terminate the natural parent's rights . . . ." § 5–313(a) (emphasis added). There is nothing in the Maryland statute that prohibits or in any way refers to consecutive termination actions.

The United States Supreme Court has never directly addressed the question of when, if ever, successive parental termination actions violate due process. Nor has the Court ever addressed what role, if any, res judicata would play in such a situation. As part of its factual and procedural narration in *Santosky,* however, the Supreme Court did note this was not the first time the State had brought a termination action against the Santoskys.

"Respondent [the State] had made an earlier and unsuccessful termination effort in September 1976. After a fact-finding hearing, the Family Court Judge dismissed respondent's petition for failure to prove an essential element of Fam.Ct.Act § 614.1.(d). See *In re Santosky,* 89 Misc.2d 730, 393 N.Y.S.2d 486 (1977). The New York Supreme Court, Appellate Division, affirmed, finding that 'the record as a whole' revealed that petitioners had 'substantially planned for the future of the children.' *In re John W.,* 63 App.Div.2d 750, 751, 404 N.Y.S.2d 717, 719 (1978)."

*Santosky,* 455 U.S. at 751 n. 4, 102 S.Ct. at 1393 n. 4.[18]

█ While we recognize that the issue of whether and under what circumstances successive termination actions

---

**18.** The only issue on appeal in *Santosky* was the constitutionality of the fair preponderance standard. Whether the State used evidence from the first termination trial at the second trial is not apparent from the reported opinions.

would violate a parent's right to due process was not squarely before the *Santosky* Court, the Supreme Court had the opportunity to but did not say that successive actions offended due process. The Supreme Court's approval of the practice is expressed in the following passage:

"The disparity between the adversaries' [parental and the State] litigation resources is matched by a striking asymmetry in their litigation options. *Unlike criminal defendants, natural parents have no 'double jeopardy' defense against repeated state termination efforts. If the State initially fails to win termination, as New York did here ..., it always can try once again to cut off the parents' rights after gathering more or better evidence.* Yet even when the parents have attained the level of fitness required by the State, they have no similar means by which they can forestall future termination efforts.

"Coupled with a 'fair preponderance of the evidence' standard, these factors create a significant prospect of erroneous termination."

*Santosky,* 455 U.S. at 764, 102 S.Ct. at 1400 (emphasis added). It is, therefore, apparent that the clear and convincing evidentiary standard was meant to counteract any potential unfairness to the parent which could result from successive termination actions. " 'Increasing the burden of proof is one way to impress the fact-finder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate' terminations will be ordered." *Santosky,* 455 U.S. at 764–65, 102 S.Ct. at 1400–01, quoting *Addington v. Texas,* 441 U.S. 418, 427, 99 S.Ct. 1804, 1810, 60 L.Ed.2d 323 (1979). A parent's procedural protection against an unfair termination action, be it a first, second, or even third action, is the heavy burden of clear and convincing evidence carried by the State. Due process, standing alone, will not afford appellant the relief she seeks. We turn next, therefore, to the doctrine of res judicata.

—Estoppel by Judgment—

■ Because appellant's argument involves the sometimes abstract concepts of due process and res judicata, we adopt the example used by the trial court to illustrate. The first trial can be conceptualized as a glass container into which evidence was placed. Appellant argues that once the evidence was placed into the container and the first trial judge determined that the level of evidence had not risen to a clear and convincing level, his order would serve as a stopper, and at no time in the future could more evidence be introduced. Instead appellant argues, at any future hearing a new container must be used and only evidence of facts *after* the first trial judge denied the petition can be introduced into the new container.

We hold that all of the "old" evidence, all evidence which was actually introduced or could have been introduced together with the new evidence was properly placed into the first container and viewed as one. This was necessary for the trial court to have a better view of what had happened in the lives of the children. The court may then measure all of the evidence *together* to determine if it has reached the clear and convincing level. We explain.

■ Both res judicata and collateral estoppel are branches of the broad doctrine known as estoppel by judgment. Res judicata, also known as claim preclusion, is direct estoppel; that is, if a suit between the same parties is upon the same cause of action, the judgment in the earlier suit is an absolute bar to a later suit, not only as to all matters which were actually litigated in the earlier suit, but as to all matters which *could* have been litigated. Collateral estoppel, sometimes referred to as issue preclusion, operates so that even if the causes of action are different, a factual issue *actually* litigated in the first case is conclusive in the second. *Klein v. Whitehead*, 40 Md.App. 1, 13–14, 389 A.2d 374, *cert. denied*, 283 Md. 734 (1978).

■ The distinction between res judicata and collateral estoppel is maintained in Maryland, and thus, is not merely

of academic interest. *Klein,* 40 Md.App. at 15, 389 A.2d 374. Collateral estoppel may sometimes be asserted even where res judicata will not apply. For example, a second cause of action may be different from the first, and, therefore, res judicata will not act as a bar. If, however, a factual determination has been made *i.e.,* a particular issue was litigated in the first action, it will be conclusive in the second. *MPC, Inc. v. Kenny,* 279 Md. 29, 33, 367 A.2d 486 (1977).[19] In keeping with the admonition of *Klein,* we will consider the two doctrines separately.

—Res Judicata—

■ In Maryland, as in most states, the "evidentiary test" is used to determine whether a cause of action is the same for res judicata purposes. If the same evidentiary facts would sustain both actions, the two causes of action are the same for purposes of invoking res judicata. *MPC, Inc.,* 279 Md. at 33, 367 A.2d 486. Substance, not form, is controlling, so that the subject matter of the litigation and not merely the pleadings should be examined when applying the test. *Whitaker v. Whitaker,* 60 Md.App. 695, 701, 484 A.2d 314 (1984), *cert. denied,* 302 Md. 682, 490 A.2d 719 (1985).

Applying the same evidence test to the two termination trials in the case *sub judice,* we cannot conclude that the same evidence could have sustained both actions. The trial court found at the first termination trial that the Department had failed to establish, by clear and convincing evidence, that it would be in the best interests of the twins to forever sever their ties with their mother. But the first trial did not result in the return of the twins to appellant. The trial judge in the first action gave the proverbial "second chance" to appellant—she was to follow the terms

---

19. There has been some movement to avoid this confusing terminology by adopting the terms "claim preclusion," *i.e.,* res judicata, and "issue preclusion," *i.e.,* collateral estoppel. *See Wool v. Maryland-National Capital Park & Planning Comm'n,* 664 F.Supp. 225, 229 (Md. 1987).

of the court order he issued. It was appellant's failure to make any attempt to comply with that order which made the second trial qualitatively different from the first.

Additionally, res judicata extends "only to the facts and conditions as they existed at the time of the first judgment and does not bar the fresh litigation of an issue which is appropriately subject to periodic redetermination, as *subsequent facts and changed conditions* may alter the status of the thing being evaluated." *Towers v. Director, Patuxent Institution*, 18 Md.App. 248, 250, 306 A.2d 597 (1973) (emphasis added). *See also Whittle v. Board of Zoning Appeals of Baltimore County*, 211 Md. 36, 45, 125 A.2d 41 (1956); *Jack v. Foster Branch Homeowners Ass'n*, 53 Md.App. 325, 333, 452 A.2d 1306 (1982). Child welfare seems to be a particularly appealing subject for periodic redetermination because children can be quickly and irretrievably scarred by negative circumstances. Changes in custody decrees are a classic example. A child custody order may be modified upon a showing of a strong reason affecting the welfare of the children. *Krebs v. Krebs*, 255 Md. 264, 266, 257 A.2d 428 (1969).[20]

In the case *sub judice*, following appellant's line of reasoning to its logical conclusion could produce disturbing practical results. The Department would be required to wait after any unsuccessful termination trial until independent new evidence reached a clear and convincing level. Without the evidence of prior events, it would be a rare situation indeed where the independent new evidence would be egregious enough to sustain a new action within a short

---

**20.** In *Krebs*, the Court determined that the case should be remanded for further evaluation of the current custody arrangement. "Obviously, if further proceedings were to reveal that the present arrangements are unsatisfactory, the chancellor would be obliged to consider what solution would bring about the best results for the children." The court did go on to observe, however, that frequent changes were not good for the mental well-being of children. *Krebs*, 255 Md. at 266–67, 257 A.2d 428.

period of time. Thus, while the parent or parents might be benefitted, the children would suffer.

Other jurisdictions which have been presented with precisely this issue have also held that res judicata poses no barrier to a second action to terminate parental rights, and does not limit the evidence which can be considered at the second action. We briefly review these holdings and the rationales behind them.

In *Matter of Newman,* 49 Or.App. 221, 619 P.2d 901 (1980), the first parental right termination action was dismissed and the State refiled two years later. The Court held that the second termination proceeding was not barred, and proof was not in any way limited by principles of res judicata. *Newman,* 619 P.2d at 903. The Court reasoned that for res judicata purposes a termination action was not so much a particular proceeding, but rather a group of facts which might or might not entitle the State to prevail. If a new substantial fact arises,[21] a new termination proceeding may be warranted. *Newman,* 619 P.2d at 904. Evidence adduced at an earlier termination proceeding may be essential in determining a parent's qualifications as a fit parent in the later proceeding and therefore must be admitted.[22] *Newman,* 619 P.2d at 905.

In *In re Juvenile Appeal,* 190 Conn. 310, 460 A.2d 1277 (1983), the State filed a successful parental rights termination action after a previous petition had been dismissed. On appeal, the Court held that because the first proceeding had not been dismissed on the merits, res judicata would not bar the second successful petition, and evidence of events prior to the first petition was therefore admissible. *In re*

---

**21.** In *Newman,* this fact was a 10–year prison sentence imposed on the father.

**22.** The Oregon Court reached this result by making an analogy to child custody determinations. "In each case [child custody and termination proceedings] that [sic] best interests of the child is the overriding consideration." *Newman,* 619 P.2d at 905.

*Juvenile Appeal,* 460 A.2d at 1281–82.[23] Although the Court resolved the issue on this basis, it went on to state the following, citing concern with problems which might arise in the future from successive termination petitions:

"The doctrines of preclusion, however, should be flexible and must give way when their mechanical application would frustrate other social policies based on values equally or more important than the convenience afforded by finality in legal controversies.

"Because the issue of whether termination of parental rights is appropriate must be decided upon the basis of conditions as they appear at the time of trial, the doctrines of res judicata and collateral estoppel ordinarily afford very little protection to a parent who has once successfully resisted an attempt to terminate his rights to a child. Parents have a constitutionally protected right to raise and care for their own children. This right is not free from intervention by the state, however, when the continuing parens patriae interest of the state in the well being of children is deemed by law to supersede parental interests. An adjudication that a ground for termination did not exist at one time does not mean such ground has not arisen at a later time."

*In re Juvenile Appeal,* 460 A.2d at 1282 (citations omitted). The Court went on to note that other jurisdictions had adopted variations of the "material change in circumstances standard." [24] This standard allows the State, upon a threshold showing of a material change in circumstances, to admit evidence of events occurring prior to any earlier attempts to terminate. *In re Juvenile Appeal,* 460 A.2d at 1282–83.

---

**23.** The first proceeding was dismissed because the State filed before the one year statutory waiting period had run, asking the court to waive it because of the mother's alleged mental deficiency and lack of personal rehabilitation. The Connecticut lower court found the State's petition premature.

**24.** *See Matter of Newman,* 619 P.2d 901, 906 (Or.1980); *In Re G.V.,* 136 Vt. 499, 394 A.2d 1126, 1128 (1978).

In *People in Interest of J.R.*, 711 P.2d 701, 703 (Colo.App. 1985), the Court held that res judicata does not bar a second action because, although the policy of limiting litigation is sound, that policy should not be applied to deprive the State of its *parens patriae* role. The Court observed that the protections "afforded by the doctrines of res judicata and collateral estoppel are sustained in termination proceedings by the continued requirement that the state meet its burden of proof before parental rights are terminated." There should be, the Court cautioned, sufficient additional facts to justify the trial court's different conclusions. The protective purpose of res judicata, to protect persons from unnecessary relitigation, is preserved as long as there are *new* evidentiary matters at issue. *People in Interest of J.R.*, 711 P.2d at 703.

We think the rationales used by our sister jurisdictions should apply to the case *sub judice*. If the State had brought the second petition to terminate appellant's rights and had alleged nothing new, there is no doubt that it would be barred by res judicata. But there were new facts and circumstances introduced at the second action which could not have been introduced at the first. Although the court did not terminate appellant's parental rights in the first action, her children remained in the custody of the State and she was ordered to work with the Department toward reunification. In order to help appellant toward this end, the trial court ordered that there be a private psychological therapist for appellant, contact with her mother, visits with the children, and counselling for the children. It appears in the case *sub judice* that the Department made an effort to comply with the order. Appellant rejected a service agreement designed to facilitate reunification. She did not regularly write to the children. There was no effort on her part to improve the unhappy circumstances which had led to the Department's obtaining custody of the children in the first place. The Department filed the second petition when it became clear that appellant's continued refusal to work toward reunification had resulted in stagna-

tion, with no likelihood of remedy. Regardless of any difficulties appellant may have had with the Department,[25] the record shows that she made no effort to cooperate with them and thus retain her parental rights. All of the foregoing amounted to substantial new reasons for termination. The new facts created a qualitatively different situation: the second cause of action was not identical, and therefore not barred by res judicata. Because the new facts had to be put into context, the trial court was correct in admitting evidence of events prior to the first action at the second proceeding. The trial court thus correctly weighed *all* evidence pursuant to the criteria set forth in § 5–313 to find that it was in the best interests of the children to terminate appellant's parental rights. The best interest of the child is the controlling consideration whenever the State seeks to terminate a parent's rights. *Washington County Dep't of Social Services v. Clark*, 296 Md. 190, 198, 461 A.2d 1077 (1983).[26]

—Collateral Estoppel—

In her brief, appellant used the terms res judicata and collateral estoppel interchangeably. They are not synonymous. As pointed out earlier, in any subsequent action, collateral estoppel bars the litigation of any issue already decided in a prior action between the parties. The trial

**25.** The trial judge considered the cultural differences which may have existed in this case. Although appellant was from another country which possibly had different attitudes toward outside interference from State agencies, the Department was charged with caring and seeing to the children's best interests. Additionally, the record shows that appellant spoke and understood English with no difficulty.

**26.** The Court of Appeals held in *Washington County* that a provision of the parental right termination statute (then Art. 16, § 76(c)) which created a presumption that it was in the child's best interests to terminate a parent's rights where the child had been in continued foster care for at least two years was constitutionally invalid. *Washington County*, 296 Md. at 196, 461 A.2d 1077. The offending provision was later deleted from the statute.

court in the first trial made two findings of fact—that appellant had not abandoned the children within the meaning of § 5–313(a)(1), and that, as of 1985, the Department had not fulfilled its statutory duty to promote reunification of the family.[27] The trial court in the case *sub judice* ruled that the Department could not relitigate these issues. Appellant does not assert that there were other factual findings made in the first trial which she was forced to relitigate in the second. We hold that appellant thus received all the benefits of collateral estoppel to which she was entitled.

## ADMISSION OF EVIDENCE

Appellant contends that the trial court based its decision to terminate her parental rights on inadmissible evidence. She argues that the cumulative effect of this improperly admitted evidence violated her constitutional right to a fair trial. We disagree and will explain, considering each evidentiary issue separately.

### —Appellant's Failure to Attend—

On the last day of the second trial, the trial court informed the parties that it would issue its opinion from the bench the following day. The United States Immigration and Naturalization Service representative, who had been bringing appellant from Baltimore each day, told the court that he would not be able to do so on the following day. The trial court then immediately arranged to have the Prince George's County Sheriff's Department transport appellant. Appellant, who had experienced some problems with the sheriff's department in the past, initially told the

---

**27.** Section 5–313(c)(1) provides:
"(c) **Required considerations.**—In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in any case, except the case of an abandoned child, the court shall consider:
(1) the *timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent....*" (Emphasis added.)

court that the arrangement would be acceptable.[28] The next day, appellant's attorney informed the court that while appellant wanted to be there to hear the court's decision, she had decided not to attend because she did not want to be transported by the sheriff's department. In its opinion, the trial court stated:

"In this Court's opinion, that set of circumstances says a lot about whether Ms. Scott is willing to alter her conduct for the sake of her children. She was not willing to endure whatever discomfort was involved in being transported by the Sheriff's Department in order to hear, in person, whether she would ever see her children again. That is sad indeed and this Court would be hard pressed to say that she was willing to cooperate with the intensive therapy that Dr. Poirier [the examining psychiatrist] stated would be necessary in order for her to adjust to having her children back with her."

The failure of appellant to attend was considered by the trial judge as evidence of her attitude. Appellant argues that the trial court should not have considered her failure to attend in making the determination to terminate her parental rights.

As stated in *Cecil County Department of Social Services v. Goodyear,* 263 Md. 611, 622, 284 A.2d 426 (1971), in an action involving termination of parental rights, "the greatest respect must be accorded the opportunity [the trial court] had to see and hear the witnesses and to observe their appearance and demeanor." In *Ellsworth v. Sherne Lingerie, Inc.,* 60 Md.App. 104, 118, 481 A.2d 250 (1984), *rev'd on other grounds,* 303 Md. 581, 495 A.2d 348 (1985), we reiterated that the admission or exclusion of evidence is a function of the trial court, and is reviewed with great latitude. Especially in matters where the best interests of the child are of primary importance, the trial court's deter-

---

**28.** Appellant's attorney later informed the court that appellant had agreed only because she thought the court would lock her up if she did not.

mination is accorded great deference, unless it is arbitrary or clearly wrong. *Beltran v. Heim,* 248 Md. 397, 401, 236 A.2d 723 (1968); *In the Matter of Malmstedt,* 243 Md. 92, 96, 220 A.2d 147 (1966); *Raible v. Raible,* 242 Md. 586, 593, 219 A.2d 777 (1966); *Kennedy v. Kennedy,* 55 Md.App. 299, 310, 462 A.2d 1208 (1983); *Kramer v. Kramer,* 26 Md.App. 620, 636, 339 A.2d 328 (1975).

A court is required to consider, under § 5–313(c)(5), "the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent's home," in determining whether it is in the best interest of a child to terminate a natural parent's rights. Considering, in isolation, appellant's absence on the last day of trial would not have been sufficient to conclude that appellant had not made an adequate effort to adjust. But the trial court did not base its opinion on this one factor in isolation from the other evidence. The trial court had other evidence to consider in determining that appellant had made little effort to adjust her conduct. Although appellant chose not to testify as a witness, her conduct, past and present, was an integral part of the determination in this action. We see no reason why the trial court cannot make inferences regarding a party's conduct and demeanor at trial even though the party does not testify. The trier of fact does not operate in a vacuum. We hold that the trial court did not abuse its discretion in considering appellant's absence.

—Written Opinion from the First Termination Action—

 Appellant contends that the trial court improperly considered the written opinion from the first parental rights termination trial, even though it had not been introduced into evidence. Appellant did not object, however, to the Department's introduction of the entire file from the previous proceeding. Nor did appellant object when the trial court took judicial notice of the file. Near the end of the second trial, the trial court announced that it had reviewed the previous trial court's opinion and intended to use it in

order to "put into context what has happened after February 1985 in determining this case." Appellant again made no objection.

Rule 2–517(a) provides in pertinent part:

"An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived."

Appellant waived any objections she might have had by failing to make a timely objection. Rule 8–131 provides that we will not ordinarily decide a question which has not been presented to or ruled upon by the lower court. The purpose of this Rule is one of judicial economy—counsel must bring his or her client's position to the attention of the trial court so that it can pass upon and possibly avoid or correct any errors in the proceedings. *Robinson v. State,* 66 Md.App. 246, 255, 503 A.2d 725, *cert. denied,* 306 Md. 289, 508 A.2d 489 (1986). We will not review points of law not properly preserved for appellate review.

—Telephone Call from the United States Immigration
and Naturalization Service—

 Upon learning that the trial court had received a telephone communication from the Immigration and Naturalization Service regarding appellant's status in the United States, appellant's counsel inquired if the court was considering that information in making its decision, and if appellant should introduce a witness in rebuttal. In response, the trial court related the information from the telephone call, *i.e.,* that there were immediate plans to deport appellant. Appellant's counsel made no objection to the receipt of this information, but rather made a proffer of a rebuttal witness' testimony. Additionally, the record reveals that deportation had been discussed frequently in order to schedule trial dates. Appellant argues that the trial court improperly considered the information that appellant was to be deported in reaching its conclusion that appellant's parental rights should be terminated.

We must again cite Rule 2–517(a) and Rule 8–131. Since appellant's counsel did not object to this evidence, and indeed on many occasions informed the trial court of the INS proceedings to deport her, she cannot now object to the trial court's knowledge of her immigration status. Even if appellant had preserved the issue, appellant has presented nothing indicating that the trial court considered the deportations as evidence that she was an unfit parent. The trial court used this information to schedule trial dates, and to ascertain whether appellant would be available for rehabilitative services.

—Expert Testimony—

 Dr. Poirier, a clinical psychologist, testified for the Department at the second trial. He had personally examined appellant in 1982, pursuant to a court-ordered psychiatric evaluation. Dr. Poirier made personal observations of appellant interacting with the twins at this time, administered a personality screening test,[29] and personally interviewed appellant. The test indicated that appellant suffered from a mixed personality disorder, with histrionic, narcissistic, and antisocial features. His observations of appellant's interaction with her children showed that appellant was very abrupt and insensitive with her children, handling them in an unnecessarily rough manner. At that time, it was Dr. Poirier's recommendation that the children should not be returned to her. At the second trial, Dr. Poirier testified that he had serious reservations about appellant's ability to parent the twins, and that even limited visitation could harm the children. Dr. Poirier's expert

---

**29.** The test administered was the Minnesota Multiphasic Personality Inventory, which is designed to detect people who have serious or perhaps underlying mental health problems. It is a widely used test, and is possibly the most extensively researched of all psychological tests. The M.M.P.I. has been translated into over 40 different languages. Appellant was given the English version. Dr. Poirier testified that, although the M.M.P.I. was not a "completely culturally free instrument,"—the test requires an ability to comprehend the questions—reading ability was the major consideration in determining whether the test results were valid.

testimony was based on the 1982 evaluation and written report, a record of appellant's testimony in the first trial, appellant's deposition taken before the second trial, federal prison records, appellant's records from the Department, and also a transcript of the testimony of Dr. Jacobs, appellant's expert witness who had testified a week previously. Psychologist Dr. Ottenstein, another expert witness for the Department, testified that the twins should not be returned to appellant. He based his opinion on his personal observations of appellant, as well as a letter written by appellant contained in the record of the first termination of parental rights trial. Appellant contends that testimony from the Department's expert witnesses should not have been admitted because it was based on improper foundations, and on documents not admitted into evidence.

Decisions regarding the admission of expert testimony are within the discretion of the trial court. *Radman v. Harold*, 279 Md. 167, 173, 367 A.2d 472 (1977). The opinion of an expert witness must have a factual premise: that is, it cannot be merely speculation or conjecture. The expert's opinion must be based on facts sufficient to support a reasonably accurate conclusion. *State Dep't of Health v. Walker*, 238 Md. 512, 520, 209 A.2d 555 (1965). The expert's opinion "has no probative force unless a sufficient basis to support a rational conclusion is shown." *State ex rel. Stickley v. Critzer*, 230 Md. 286, 290, 186 A.2d 586 (1962). This factual basis may be acquired during trial by the expert's observation of the person on whom he is going to render an opinion. *Attorney Grievance Comm'n v. Nothstein*, 300 Md. 667, 679, 480 A.2d 807 (1984). It may also be contained within a hypothetical question, *Marshall v. Sellers*, 188 Md. 508, 517–519, 53 A.2d 5 (1947), or it may be obtained from "second hand" (often hearsay) information. *Nothstein*, 300 Md. at 679, 480 A.2d 807.

An expert witness may testify to an opinion based on facts ordinarily inadmissible as hearsay, but which are facts of the type reasonably relied upon by experts in

the field. *Nothstein,* 300 Md. at 679, 480 A.2d 807. The expert should relate the information on which the opinion is based so the court can decide if it is reliable and was obtained in a trustworthy manner. *Madden v. Mercantile–Safe Deposit and Trust Co.,* 27 Md.App. 17, 44, 339 A.2d 340 (1975). The information does not have to be admitted into evidence for the expert to use it in forming an opinion. If the facts on which the expert bases his or her opinion are inadmissible as substantive proof, they may still be used to provide the required factual basis for the opinion. *Ellsworth v. Sherne Lingerie, Inc.,* 303 Md. 581, 603, 495 A.2d 348 (1985).

The Department's experts based their opinions on sources commonly relied upon by experts in the field and fully revealed to appellant. We therefore hold that the trial court made no error in admitting this expert testimony.

—Sequestration Order—

Appellant contends that the Department's expert witnesses reviewed trial testimony in violation of a witness sequestration order. Sequestration had been ordered by the trial court, upon appellant's request, at the beginning of trial. Appellant was permitted to call her expert, Dr. Jacobs, out-of-turn during the Department's case-in-chief. The Department's experts, Drs. Poirier and Ottenstein, were thus able to review a transcript of Dr. Jacobs' testimony before giving their own testimony. They used Dr. Jacobs' testimony as part of the basis of their own expert opinions.

Rule 2–513 requires mandatory exclusion of witnesses on a motion of any of the parties or by *sua sponte* order of the court. Rule 2–513(a), however, makes an explicit exception for expert witnesses, so that experts are permitted to remain during certain testimony if they are later to render an opinion based on that testimony given at the trial. *Burton v. State Roads Commission,* 251 Md. 403, 404, 247 A.2d 718 (1968). Allowing an expert witness to review a

transcript of prior testimony is the essential equivalent of the expert's presence in the courtroom.

Appellant relies on *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1374 (5th Cir.1981), to support her argument that the Department's expert's reading of Jacobs' testimony was error. In *Miller*, the Court held that an expert witness' reading of a trial transcript violated a sequestration order. In *Miller*, however, the parties were in federal court, and thus Federal Rule of Evidence 615 regarding sequestration of witnesses was applied. Unlike Md.Rule 2–513, Fed.R.Evid. 615 does not explicitly contain the exception that expert witnesses may be present during testimony on which they will be asked to render an opinion. Accordingly, the court did not err in allowing Poirier and Ottenstein the opportunity to review a transcript of Jacobs' testimony.

## STANDARD USED BY TRIAL COURT TO TERMINATE PARENTAL RIGHTS

■■■■ Appellant contends that the trial court erroneously based its decision to terminate her parental rights on her alleged failure to comply with the court orders issued after the first trial, instead of on the statutory requirements of § 5–313. She claims that the Department must prove present and future unfitness for parenting before her parental rights can be terminated, and maintains that her failure to comply with the court order does not prove parental unfitness.

The trial court must follow the standard as set forth in § 5–313 when determining whether parental rights are to be terminated. Pursuant to § 5–313(a), if children have been adjudicated in need of assistance, as in this case, the trial court is required to consider the factors listed in § 5–313(c). These factors are: [30]

---

**30.** We cite to the 1984 statutory compilation of § 5–313(c), as this was what the trial court applied in the case *sub judice.* Section 5–313(c) was amended in 1987 to add a sixth requirement:

"(c) **Required considerations.**—In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in any case, except the case of an abandoned child, the court shall consider:

(1) the timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent;

(2) any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement;

(3) the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest;

(4) the child's adjustment to home, school, and community; and

(5) the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent's home, including:

(i) the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent, but the court may not give significant weight to any incidental visit, communication, or contribution;

(ii) if the natural parent is financially able, the payment of a reasonable part of the child's substitute physical care and maintenance;

(iii) the maintenance of regular communication by the natural parent with the custodian of the child; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascer-

---

"(6) all services offered to the natural parent before the placement of the child, whether offered by the agency to which the child is committed or by other agencies or professionals."

tainable time, not exceeding 18 months from the time of placement, but the court may not consider whether the maintenance of the parent-child relationship may serve as an inducement for the natural parent's rehabilitation."

In the case *sub judice*, the trial court applied the statutory requirements to the facts. The performance plan and the prior court order were part of, but not the entire basis for, the determination. The trial court's opinion reflects that each factor required by § 5–313(c) was duly considered, and our independent review indicates that each was supported by an adequate factual finding. Parental fitness is implicitly part of the statutory scheme—§ 5–313(c)(5)(i) through (iv) sets out standards by which the court determines parental fitness.

The trial court specifically found, in reference to § 5–313(c)(5)(i) through (iv), that appellant had not maintained regular contact with her children. She was not receptive to establishing a plan to communicate with the children on a regular basis while she was incarcerated. During two years, between April 1985 and the second trial in May 1987, appellant sent one letter and two cards to each child. When she was not incarcerated, appellant neglected the children for extended periods of time, leaving them without food or proper care, even leaving the country giving no indication of when or even if she would return. The court also found that there had been virtually no communication between appellant and the foster parents. The trial court considered expert testimony indicating appellant's personality disorders, her refusal to get intensive treatment, and her lack of cooperation. The court also considered the special parenting needs of these children and concluded that additional services would be needed, but that appellant was unlikely to cooperate in receiving those services.

Based on all the factual findings and the application of § 5–313, we hold that the trial court did not err in terminating appellant's parental rights.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.